IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 2, 2004 Session

# C. NOELLE CHAFFIN v. MARCUS ELLIS

**An Appeal from the Chancery Court for Williamson County**
**No. 27608      R. E. Lee Davies, Judge (by interchange)**

---

**No. M2003-01620-COA-R3-CV - Filed March 24, 2006**

---

This is a divorce and child custody case. The husband and the wife were married in February 1998. Throughout the marriage, they lived together with the husband's mother. The parties' relationship began to deteriorate soon after the wedding. The wife felt that the husband and his mother were controlling and oppressive, while the husband felt that the wife was unfit. One child was born of the marriage. In October 2000, the wife filed the instant petition for divorce. After a nine-day trial, the trial court granted a divorce to the wife on the ground of inappropriate marital conduct, and designated the wife as the primary residential parent of the parties' child. The trial court also awarded the wife a portion of her attorney's fees and discretionary costs. From that decision, the husband now appeals. We vacate a portion of the award of costs, and affirm as to the remaining issues, finding that the evidence preponderates in favor of the trial court's opinion in all other respects. The cause is remanded for reconsideration of a portion of the award of costs for expert fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Vacated in part, Affirmed in part, and Remanded for a Determination on Costs and Appellee's Attorney's Fees**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which and ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Martin S. Sir and Donald Capparella, Nashville, Tennessee, for the appellant, Marcus Ellis.

J. Nick Shelton and R. Reid Street, Franklin, Tennessee, for the appellee, C. Noelle Chaffin.

**OPINION**

**I. FACTS**

This is a tortuous saga of an ill-fated marriage. Defendant/Appellant Marcus Ellis ("Father") lived in Dallas, Texas. Father had a varied background, including a stint as music minister of a large church. He lived with his mother, Eva Jane Ellis ("Grandmother"), and together they ran a successful catering-and-event business in Dallas in a refurbished shopping center furnished with antiques and made into an event facility called Ellis Castle. At church in the spring of 1998, Father met Plaintiff/Appellee Noelle Chaffin ("Mother"). At the time, Mother was working several jobs, including one in insurance and one as a nanny caring for two young children. When they met, Father was forty-one years old and Mother was twenty-four years old. Neither had ever been married.

While they were dating, Mother and Father studied the Bible together and discussed religious beliefs at length, and Mother had many discussions on this and other topics with Grandmother as well. Mother left her other employment and began working for Grandmother at Ellis Castle. After a few months, Father and Mother decided to marry. They agreed that Mother would become a full-time homemaker and prepare to raise the children they hoped to have.

Mother had a strained relationship with her family, and Mother's parents objected to her relationship with Father, saying that Father and Grandmother were involved with a cult. Father encouraged Mother to move from her parents' home, insisting that Mother's parents should admit that they lied about him and repent their comments about Father or she should have nothing further to do with them. Mother moved to accommodations furnished by Father without telling her parents. Mother had no further contact with her family, and Grandmother assumed the role of Mother's "mother," assuring Mother that she was "leaving the cursed and entering the land of blessing." A large, elaborate wedding at Ellis Castle was planned, primarily by Grandmother. Mother's family was not invited to the wedding. Two or three of Mother's friends were invited, while Father and Grandmother invited hundreds of guests.

In April 1998, Mother and Father were married in a lavish ceremony performed by an ordained minister. However, the couple did not obtain a marriage license from the State of Texas because Father believed that a license was unnecessary and would result in unwanted State interference. Therefore, theirs was a common-law marriage, recognized in the State of Texas.[1]

After the wedding and honeymoon, Father did not move from Grandmother's house in Texas; the couple lived in the house in Texas with Grandmother. Mother was to undertake learning how to perform her duties in the home. Father asked Grandmother to "mentor" Mother in performing domestic tasks such as housecleaning, cooking, laundry, ironing Father's shirts, and polishing; in "womanly art subjects" such as embroidery, pretty handwriting and calligraphy; and in "principles of Christian thought and behavior."

---

[1]The parties do not dispute the validity of their marriage.

Soon thereafter, the relationship between Father and Mother became strained. Father became dissatisfied with Mother's behavior and with her performance of her household duties. On April 19, 1998, Father began keeping a journal in which he recorded his observations regarding Mother's behavior, focusing on that which he deemed to be unsatisfactory. Among other criticisms, he wrote that Mother became increasingly angry, ungodly, untruthful, and was emotionally unstable and prone to what he termed "tantrums."

In June 1998, Mother became pregnant. She received no medical attention from a trained medical professional until late September or early October 1998. At that time, Grandmother arranged for a midwife, Vickie Hall ("Hall"), to examine Mother. Despite Hall's requests to meet privately with Mother, Father and Grandmother were present during all of Hall's sessions with Mother, including physical examinations. Mother's manner was meek and quiet during the visits, and virtually all questions were asked by Grandmother and Father.

The problems between Mother and Father deepened. In the face of hours of direction and "instruction," and increasing disapproval from both Father and Grandmother, Mother's behavior spiraled downward. Mother's attempts to perform in accordance with expectations and win approval from Grandmother and Father invariably failed; this led to episodes of despair, self-loathing and self-mutilation, as well as anger and chafing at the constraints. This behavior resulted in further disapproval from Grandmother and Father, to which Mother responded with remorse, supplication and pleas for forgiveness of transgressions and for help in attaining the expected standards.[2] As part of this cycle, in the fall of 1998, with Father's approval, Mother and Grandmother spent a month crafting a code of conduct, termed "Sixteen Promises," by which Mother agreed to live. The Sixteen Promises included the following:

– I will stand tall to my calling to be Marcus' godly helpmeet and keeper of the home.
– I will be in right relationship with family members showing proper respect and honor.
– I will maintain a selflessly submissive attitude in all family relationships.
– I will receive correction gladly and when corrected at a task, I will not exaggerate the mistake by adding unrelated subjects.
– I will be obedient.
– I will not be an emotional woman, led away by a deceived heart.

Each of the promises was followed by numerous scripture quotations. Mother was to memorize and recite the Sixteen Promises, as well as Biblical passages on the behavior standards she was to meet. Father's journaling during this time reflects his disapproval of her performance of domestic tasks such as cleaning and cooking, her failure to complete an elaborate scrapbook of their honeymoon, and her clumsiness with a baby doll used to "practice" for arrival of their baby. His journal included

---

[2]Mother wrote Grandmother elaborate calligraphy letters apologizing for various behaviors and promising repeatedly to do better.

reproaches for Mother's comments reflecting either anger at the disapproval from Grandmother and Father or self-hatred for not meeting expectations.

During this time, the midwife Hall moved from the Dallas, Texas area. Grandmother secured a substitute midwife, Jane Gandy ("Gandy"), who examined Mother in January 1999. As with Hall, in her sessions with Gandy, Mother was accompanied at all times by Father and/or Grandmother.

On February 24, 1999, Mother gave birth to the parties' daughter, Eva Elisabeth Ellis ("child"), in a home birth with Gandy attending. During childbirth, Mother was not given an anesthetic; Father and Grandmother had persuaded her to agree to a natural childbirth. Prior to the birth, Father had decided that he did not want a birth certificate to be issued by the State of Texas, because he did not want governmental interference with his family.[3] Gandy, however, eventually filed a birth certificate of sorts for the child, with only the child's last name, date of birth, the city and county of the birth, where the birth occurred, the name of the attendant, Mother's first name, and Father's full name. Father chose not to have the child examined by a pediatrician, and also chose not to have the child immunized.

Father and Grandmother continued to work together in the catering business, going to Ellis Castle during the day and leaving Mother at home to care for the baby. Father's journaling includes severe criticism of Mother's parenting skills, housekeeping efforts and her failure to do expected reading assignments. Father's journaling also reflects the continued cycle of Mother's emotional response, alternating from pleas for forgiveness for shortcomings and earnestly praying with Grandmother and dedicating herself to be being "born again," to episodes of anger, self-loathing and self-mutilation. In April 1999, Father ended sexual relations with Mother, stating in his journal that he "asked her to sleep in the guest room" because he was "afraid of her violent temper."

Later that summer, Father and Grandmother posted in the home a document entitled "24 Family Ways," which were discussed by Father, Grandmother and Mother at length, point by point. Mother was expected to memorize and recite the "24 Family Ways" and to abide by them. Father began making red notations on a calendar when Mother would have a "tantrum," and Grandmother would "counsel" Mother long into the night. Meanwhile, Father complained that the baby was the "sole object of [Mother's] affections" and that she would attempt to get the baby's attention while Father was holding the baby. Subsequent journaling expresses disapproval of Mother's excessive hugging, "sensual kisses" and "inappropriate stroking" of the baby, as well as Mother's protests at being excluded from caring for her. Mother wrote Grandmother a note of apology and repentance, promising never again to "rub the baby . . . or fawn over her" or "say 'Mommy loves you' over and over again, for this is weird."

As the year 2000 ("Y2K") approached, Father decided that the family should move from the city to an isolated rural area. In November 1999, Father and Grandmother sold the catering business,

---

[3]During the trial, the trial court expressed concern over the lack of a complete birth certificate, stating, "I'll take care of that right now. I'm going to make sure this birth certificate is amended so that all information is entered, all of it."

Ellis Castle, for $1.5 million. Father and Grandmother bought a farm in a rural area in Tennessee, near Waynesboro, for $250,000. Mother's name was not on the deed. The family, Grandmother, Father, Mother and the baby, moved into a house located on the farm. Since Father and Grandmother were no longer running Ellis Castle, they were not required to leave the home during the day.

After the move, the problems between Mother and Father grew still worse. Father claimed that Mother was disrespectful toward him and Grandmother, and that Mother was constantly upsetting the baby with her "tantrums." Father's journaling from December 1999 states that Mother "has been asked to leave the main floor to think, pray, rework her motives, life choices" and that there was at that time "complete separation." At that point, Mother was moved into isolation in her bedroom in the lower level of the house and was forbidden to see her daughter, who was kept upstairs. Mother was required to work on "neutralizing projects," which were writings by Mother whereby she would apologize for her errant behavior towards Father and Grandmother. These writing were long, elaborate acknowledgements of Mother's alleged wrongdoings on topics such as "How I Destroyed My Marriage." Sometimes they were copied and recopied many, many times. During this time, Mother was not to leave her room except to go to the bathroom, escorted, and Father brought Mother her meals to her bedroom while she was in isolation. The writings were to no avail, as Mother remained in isolation through Christmas and afterward for a period of months and was permitted no contact with her daughter.

On March 12, 2000, while still in isolation in her bedroom in the house, Mother argued with Father when he came to her room. Mother accused Grandmother and Father of conspiring to take her daughter away from her, and asked Father if he ever wanted to have sexual relations with a woman again. Father was infuriated and determined that Mother would be evicted from the house, still with no contact with her daughter.

Father removed Mother from the main house on the farm and placed her in a tenant house on the property, referred to as the "blue house" or the "Hill House,"[4] that had been used for storage. The tenant house was not within sight of the main house; it had painted-over windows, no hot water and no stove. Father told Mother that, in order to stay in the Hill House, she would be required to sign and follow his ten written rules. Under those rules, Mother was not allowed to waste water, food or electricity, she was not allowed to commit careless acts, she could not open the front door or back door or answer the door if someone knocked, and she could not leave the house for any reason. Mother slept on a cot, and Father brought her groceries twice a week. She was to continue writing her "neutralizing projects." Mother was still permitted no contact with her daughter.

On April 9, 2000, after not having seen her daughter since early December 1999, Mother decided to write Father a letter. The letter asked Father to allow Mother to move back into the family home and see their child. After writing the letter, Mother left the Hill House to personally

---

[4]Later, Father and Grandmother called the house the "Hope Cottage."

deliver the note to him at the main house, by leaving it on the front step and ringing the doorbell. Her leaving the Hill House constituted a violation of Father's rules.

Mother's transgression enraged Father. He immediately wrote two lengthy documents entitled "Bill of Divorcement" and "Terms and Conditions of Divorcement." The next day, on April 10, 2000, he delivered them to Mother at the Hill House and told her that he was divorcing her and that she must leave. In the Bill of Divorcement, Father purported to divorce her without the benefit of a court order, since they had no marriage license from any state. He described his perception of Mother's conduct and cited the same as the basis for the purported divorce. The document was prefaced by numerous disparaging comments about Mother's family, Mother's lack of money, and his past actions to benefit her. Father stated:

> –. . . I offered to assist [Mother] - even prior to our marriage. I asked my own mother to graciously begin the immense task of mentoring this woman. Hundreds of documented hours were spent teaching on every topic imaginable from homemaking, hygiene, kitchen prep and cooking, laundry, ironing, polishing, cleaning, mothering, home birthing, to principles of Christian thought and behavior, rational thinking procedures, practical work ethic, womanly art subjects such as embroidery, hand writing and calligraphy, and many more. . . . This mentoring kindly continued throughout most of the period of our marriage;
> – [Mother] . . . began to display tendencies of unchristian behavior from the start of our marriage and I began the immense task of trying to deal with erratic, sociopathic but worst of all, violent behaviors;
> – [A] bizarre patchwork began to emerge of the behaviors of an ungodly, vain, incredibly lazy, proud, massively self-centered, doubled-minded, angry, careless, babbling, unreasonable, scripture-twisting, Laodicean, Phillistine, self-indulgent juvenile delinquent who tells multiple lies multiple times without a shred of conscience or remorse, bearing no resemblance to a woman of 26 years of age in her conduct or lifestyle, I began to document her behavior in diary form.
> – . . . During our early months of marriage her mentor/mother-in-law developed with her, her own code of ethics, which she memorized. They became appropriately titled, her "Promises." Our 24 "Family Ways" were also memorized in detail. The 10 commandments also were required to be memorized. These codes are our family's rules by which we abide. Although curiously able to recite these and many scriptural passages by heart, there was never a significant attachment to her behavior or lifestyle choices.
> – The conscience of [Mother] has been totally seared and she is disastrously double-minded, unstable in all her ways.
> – By conservative estimates she has broken her own Promises, our Family Ways, the Ten Commandments and her own word multiple times beyond the Biblical "70 x 7" even past several thousand times. I estimate 5,000 to 7,000 times.
> – Often disregarding specific instruction, [Mother] became a veritable "bull in a China shop" with items suffering under her careless abuse. Even soft goods such as

towels, washcloths, bedding and sheets, and clothing items were often irrationally misused.

– Whereas [Mother] does not serve the god of Abraham, Isaac and Jacob as I do, this is a most clear case of unequal yoking.

– Whereas [Mother] had been given every advantage known to man in preparing for motherhood, she repeatedly and purposefully abused the baby time and time again. The abusive incidents have been legion.

– . . . By November of '99, [Mother] was released from all duties of normal family life and began to write the "projects" in her private bedroom. . . . Of course, this should have been a time of extreme blessing to her as her meals were catered to her months on end and it was her only job to rethink her actions and quietly become the woman she had promised to be on our wedding day. But this too was turned into cursing as she would not refrain her mouth and actions in any way to match the family codes of behavior (having memorized them in detail).

– Whereas [Mother] was asked to leave the marriage bed for the first of many times in December of 1998 because of her grossly rebellious behavior and since April of 1999 this became the permanent arrangement, since no change was ever seen in her endless cycle of selfishness, foolishness, arguing, lying and hateful violence. This constitutes abandonment;

– [Mother] has a genuine hatred for all authority in her life and is basically lawless.

– Abuse, violence, abandonment, deceit and hatred are the grounds for the complete separation and divorce of the lives of [Father] and [Mother].

On this basis, then, Father purported to "divorce" Mother by his own pronouncement. In the "Terms and Conditions of Divorcement," Father set out, among others, the following terms for the alleged divorce:

– There being no need to secure state approval via a "marriage license", no state approval for divorce is necessary;

– In kindness to [Mother], [Father] agrees to graciously provide her with a one-time lump sum of $2,000.00 in final settlement in exchange for the complete execution of the . . . conditions [of divorcement];

– [Mother] agrees to never, under any circumstances, enter into the states of Tennessee and Texas nor send by proxy her representatives to these states.

– [Mother] hereby acknowledges her abuse of their infant child and [Father's] family, the repeated violation of her adopted family's ways, her violence, her insane envy, her continual breaking of the Commandments, her massive lying, her selfish intentions of suicide and/or murder, her outrageous hatreds, her incredible laziness as well as her unstoppable mouth;

– [Mother] willingly relinquishes all rights and responsibilities to the child who is the fruit of the marriage, never to see or communicate with her in any way even via proxy;

– [Mother] knows that any violation of these agreements will force [Father] to report her to the proper authorities for her possible immediate incarceration on charges of violence, abuse, fraud, mental anguish and mental cruelty among others, all documented and recorded.

– [Mother] agrees that no legal action against [Father] or his family or his interests will ever be pursued by her or her representatives at anytime in the future;

– [Mother] voluntarily ended her "contract" (as she stated) at the Hill House on the estate by purposefully violating the rules of the house and has asked to leave the premises, while her "neutralizing" projects have not been finished. The covenant of the marriage is hereby dissolved.

Therefore, in this document, Mother was required to promise to never again see her daughter. Mother and Father discussed the documents for about two hours, and Father required her to sign them both. Subsequently, Father gave her $2,000 and took her to the bus station in Memphis, Tennessee. Mother was put on a bus to Branson, Missouri.

Soon after she arrived in Branson, Mother rented a small room in a motor lodge and, pursuant to Father's instructions, sent a postcard to him with her address so he could send her the rest of her belongings. On the postcard, Mother begged Father to consider allowing her to move back into the home with the family and their baby. Father sent Mother her possessions, but rebuffed Mother's pleas to move back to the marital home and see their child. After about two weeks, Mother finally worked up the courage to contact her family in Texas, with whom she had not communicated since her marriage in 1998.

## II. PRE-TRIAL PROCEEDINGS

On October 20, 2000, with assistance from her family, Mother filed a petition for divorce in the trial court.[5] As grounds, Mother asserted irreconcilable differences, physical and mental cruelty, and inappropriate marital conduct.[6] Contemporaneously, Mother filed a request for an emergency order granting her custody of the parties' child, Eva Elisabeth. In her affidavit supporting the emergency request for custody, Mother explained the circumstances of the child's birth, depicted Father as a religious extremist, asserted that Father and Grandmother controlled every aspect of Mother's relationship with Eva Elisabeth, and indicated that they had denied Mother contact with

---

[5]Mother filed her petition in the Chancery Court for Wayne County. In November 2000, the case was transferred to the Chancery Court for Perry County, because most of the farm on which the Ellis family lived was located in that county. In January 2001, the case was transferred to the Chancery Court for Williamson County by agreement of the parties.

[6]On February 7, 2001, Mother filed a separate action against Father and Grandmother for outrageous conduct, intentional infliction of emotional distress, willful and malicious conduct, assault and battery, civil conspiracy, false imprisonment, and misconduct that is "atrocious and utterly intolerable in civilized society." Mother later dismissed the lawsuit.

her daughter. Attached to Mother's affidavit were copies of the Bill of Divorcement and Terms and Conditions of Divorcement, and she cited specifically to the provisions that purported to keep her from ever again seeing her daughter. Based on those and other representations in Mother's affidavit, the trial court entered a temporary restraining order against Father, granting Mother immediate custody of the child. On October 21, 2000, with the aid of the Wayne County Sheriff's department, Mother went to the farm in Tennessee and retrieved Eva Elisabeth from Father, and the two were driven back to Texas by her lawyer at the time, Gregory Tibbets. At that time, Mother had not seen her daughter since December 1999.

After she returned to Texas, Mother took Eva Elisabeth to a pediatrician, the first physician to treat the child. The physician immediately gave Eva Elisabeth immunization shots.

In December 2000, Father filed a petition in the Tennessee trial court to set aside the previous order and to return Eva Elisabeth to him. On December 8, 2000, the trial court ordered that Eva Elisabeth be returned to Father, on the basis that there was no order sanctioning removal of her from the State of Tennessee, and that there was no adequate proof that irreparable harm would result if she were returned to Father. With this order in hand, Father drove to Texas and, with the help of the Dallas police, regained custody of Eva Elisabeth and brought her back to Tennessee.

On December 13, 2000, Mother filed a motion for visitation with Eva Elisabeth. The trial court conducted a hearing in the matter. On January 8, 2001, the trial court entered an order requiring both parties to undergo psychological evaluations, and resetting the hearing on Mother's petition for visitation for after the evaluations had been performed. The trial court appointed David McMillan, Ph.D. ("Dr. McMillan"), to perform the required evaluations.

On January 12, 2001, Father filed his answer to Mother's petition for divorce as well as a counterclaim for divorce. Father asserted as grounds Mother's inappropriate marital conduct, and claimed that Mother posed a danger to the parties' child. In the meantime, Dr. McMillan and Evelyn M. Frye, Ph.D. ("Dr. Frye") conducted psychological evaluations of the parties.

On January 16 and 17, 2001, the trial court, Judge Russ Heldman presiding, conducted a hearing on Mother's petition for visitation. Mother, Father, and Grandmother testified at the hearing. Dr. McMillan and Dr. Frye testified regarding the mental stability of Mother and Father. Dr. McMillan noted problems with both parties, but found in particular that Father lacked the emotional capability to raise the child, and recommended that Father's visitation be supervised. Much of Dr. McMillan's recommendation that Father's visitation be supervised rested on his belief that Father was not capable of cooperating with Mother. Dr. McMillan recommended that Father begin to have unsupervised visitation with his daughter only after "[Mother] and the Exchange Club staff believe that [Father] can cooperate with [Mother] . . . ." He opined that, "[s]o long as [Father] continues to attack [Mother] as unfit and incompetent, it is difficult to imagine that he can give [Mother] the respect that she deserves as the child's primary caregiver." In contrast, Dr. Frye opined that Mother would not be capable of parenting their child, while Father would be an effective parent.

Relevant to this appeal, in Mother's testimony at the hearing, she likened her life with Father to living in a prison. She stated that Father and Grandmother would not let her out of the house in Texas, and that she had no freedom. References were made to locks on doors, and she asserted that she was "locked away from our daughter." Mother explained that Father was able to cut her off from her parents by making her believe that they were evil. After Mother's descriptions, the trial court commented, "It sounds like a cult," and Mother responded, "I know; and it was." Also at the hearing, Mother denied Father's accusations that she screamed at him, explaining that she only raised her voice at him. Mother's attorney referred to the farm in Tennessee as a "two hundred and ten acre compound."

On January 18, 2001, relying on the psychological evaluation of the parties by Dr. McMillan, the trial court entered an order granting Mother temporary custody of Eva Elisabeth and suspending Father's visitation, pending the results of a full psychological evaluation of Father by Dr. McMillan. Judge Heldman found Mother to be a credible witness, and expressed his "strong suspicion . . . that [Father] has caused [Mother] severe, unusual emotional trauma bordering on sinister." Father sought an interlocutory appeal from Judge Heldman's decision barring him from visiting his daughter, which was granted by the appellate court.

Meanwhile, despite Mother's extreme allegations about Father, she wrote letters to him on June 26, 2001, and again on July 7, 2001, attempting to reconcile with him. On July 21, 2001, the parties met at a park, with their daughter present, and Father secretly recorded their conversation.[7] In the transcript of the recording, as the parties played with Eva Elisabeth and commented on her progress, Mother responded to Father's numerous pointed questions by admitting to Father that, during the marriage, she broke her word "over and over," and she conceded to him and that her attorney had exaggerated some facts to the trial court in support of Mother's petition for custody. In response to Father's interrogation, Mother agreed with Father that he had never put locks on her doors, as indicated to the trial court by Mother and her attorney; she explained to Father that she had only assumed that the doors were locked. She also admitted to Father that they had reached an agreement not to invite her parents to their wedding, and that it was inaccurate for Mother to indicate in her testimony that Father would "not allow" her to invite her parents or her friends. Further, Mother agreed with Father's assertions that it was inaccurate to describe the farm as a "compound" and Father as a "cult leader." Finally, Mother agreed with Father that depicting him as "the most controlling, dominant person in the universe, controlling Christian" was "completely inaccurate." Mother said, "Now, that I see it, it's wrong, but it lends itself to the exaggeration of how things were, when they really weren't that way."

Based on Mother's admissions in the secretly recorded meeting in the park, on September 5, 2001, Father filed a first amended emergency motion to modify the order denying him visitation with their child. After receiving the motion, Judge Heldman refused to hear Father's proof. On September 13, 2001, Mother filed an affidavit in the trial court recanting the comments she made

---

[7]The first meeting actually occurred on July 17, 2001. Father's attempted recording of the July 17 meeting failed, and a second meeting on July 21 was arranged.

to Father in the park and stating that she "stand[s] by all my prior testimony provided in this case." Mother said that the statements made to Father in the park were "attempts . . . to reason with him. . . . I was trying to bring him back to truth and attempt to reconcile our marriage for the sake of our daughter who needed a father and for my sake I needed a husband." Judge Heldman again refused to hear the recordings of the meeting with Mother submitted by Father. On September 28, 2001, in accordance with Dr. McMillan's recommendation, Judge Heldman permitted Father to have supervised visitation with his daughter.

Meanwhile, the appellate court heard Father's previously filed interlocutory appeal of the decision denying Father visitation with his daughter. On October 30, 2001, the appellate court ruled that the trial court had improperly denied Father visitation, and ordered that a full evidentiary hearing on the issue of visitation take place within fifteen days. Pursuant to this order, Judge Heldman set a hearing for November 7, 2001. Father moved for a continuance, and Judge Heldman denied his motion. When Father's counsel did not appear for the November 7, 2001 hearing, Judge Heldman dismissed Father's petition, finding a failure to prosecute. In response, Father filed a motion with the appellate court for an emergency rehearing. The appellate court granted Father's motion.

In the meantime, on November 9, 2001, Father filed a separate lawsuit in the United States District Court for the Middle District of Tennessee. The federal lawsuit named as defendants Judge Heldman, Mother, her attorney Robert Todd Jackson, Dr. McMillan, and the Exchange Club. In the lawsuit, among other things, Father alleged that Judge Heldman had made a false record in Father's divorce case and used his office as an offensive weapon. Subsequently, Father's federal complaint was dismissed. The federal district court determined that Father's complaint was objectively unreasonable. The federal court found that Father "continues to engage in making impertinent and scandalous allegations against the Defendants, notwithstanding the express warning of the Magistrate Judge not to do so." The federal court awarded the defendants their attorney's fees for defending the frivolous lawsuit, an amount totaling over $92,000, including $9,375 to Mother.

Meanwhile, the divorce case was assigned to Judge R. E. Lee Davies, who heard it by interchange. On December 12, 2001, Judge Davies conducted a hearing on the matter. On January 4, 2002, the trial court entered an order removing Dr. McMillan as the trial court's appointed expert, but allowing either party to call him as a witness at trial. In addition, the trial court determined that Dr. McMillan's reports did not support a finding that Father posed a danger to Eva Elisabeth; it held that Father should be permitted to begin exercising regular visitation with her pending a final hearing.

### III. TRIAL

The trial in this matter commenced on September 11, 2002. Testimony was heard intermittently for the next three months, and would ultimately last for nine days. Though the case was scheduled to conclude in January 2003, on January 7, counsel for Father was permitted to withdraw, resulting in a further continuance. After Father obtained new counsel, the testimony resumed and the trial was finally concluded on March 18, 2003. Mother and Father testified at

length, as well as Grandmother, a host of experts and additional fact witnesses. Judge Davies periodically interjected comments and asked questions throughout the lengthy trial.

Mother testified that, after she began dating Father, he and Grandmother methodically convinced Mother that her family and friends were ungodly and evil, that the concerns that they expressed to her about Father were lies, and that she should obey God and leave everything she had known before to become part of their family. She understood that his vision was that God intended her to be submissive to him as her husband, and she agreed with that. She said that Father explained that he was living with Grandmother because he was not yet married, so that he would have Grandmother's blessing, and that they would get their own home after they got married. However, that did not occur. Mother said that she was persuaded not to invite her family and friends to their wedding.

From that point on, Mother said, she was isolated inside Grandmother's Texas home, under Father's control and fearful of the consequences of his disapproval. She said that she had no car and had been told not to leave the house, answer the door or use the telephone except to talk to Father or to Grandmother. Mother recalled an incident during this time in which Father's brother had a stillborn baby, and Father told Mother that his brother's child was born dead because his brother had left his ministry and did not seek the Lord with all of his heart, and that the stillborn child was God's judgment on his brother. This led Mother to be afraid of something happening to her or to her children, so she resolved to follow Father's instructions. Throughout her testimony, Mother maintained that Father and Grandmother isolated her, manipulated her and controlled her mind.[8]

In her testimony, Mother described in detail her relationship with Father and Grandmother. For example, soon after the couple returned from their honeymoon in March 1998, Mother was instructed by Father and Grandmother to perform numerous household chores, including preparing everyone's breakfast and dinner. She explained that she was to rise early and dress and put on makeup. Before breakfast, Mother was responsible for preparing hot tea for everyone for the family Bible study every morning at 6:30 a.m., led by Father. She was told what to cook for dinner, was expected to wear a dress or skirt for dinner, and she was reprimanded if she deviated from the instructions.

Mother described a variety of punishments and deprivations utilized by Father and Grandmother to indoctrinate her and secure her adherence to their expected standards of behavior. These increased in severity as the relationship between Mother and Father deteriorated. In the beginning, Grandmother spent many hours with Mother, instructing her on how to perform the household tasks expected of her, setting out an elaborate schedule of tasks to complete, and counseling her on living in accordance with the Ellis family religious standards. Father would repeatedly admonish her to be quiet, calm, and still. Later, after she became pregnant, Father registered his disapproval of her by withholding marital relations with her. In order to resume sexual

---

[8]Mother repeated this explanation to the point that the trial judge asked her to simply say "ditto" when she wanted to give that response to a question.

-12-

relations, Mother said, Father required her to spend a month, under Grandmother's tutelage, drafting the "Sixteen Promises," each supported by numerous scriptural quotations, for Father's approval. To show her commitment to live a godly life, she was required to memorize and recite the Sixteen Promises, the Ten Commandments, and later the 24 Family Ways and other Biblical passages, and to live in accordance with them to Father's satisfaction. Nevertheless, a few months after their baby was born, Father ceased entirely having any marital relations with Mother.

When Mother became pregnant, she said, seeing a physician was not an option, and Father and Grandmother would not permit her to have private consultations with the midwife selected by Grandmother. Both Father and Grandmother attended all of the visits with the midwife. Mother testified that Father admonished her that, during the childbirth, she was not to yell or scream in front of the midwife, because that would reflect badly on the Ellis family. Mother said that, after Eva Elisabeth was born, Father did not want a birth certificate filed because he was afraid that the government would have knowledge of them and he wanted to keep them from the government. Likewise, Father was suspicious of immunizations and did not want their daughter seen by a pediatrician. Mother was not permitted to take Eva Elisabeth anywhere by herself.

Mother said that, because Father was dissatisfied with the way she performed her household duties, he instructed her to no longer polish his shoes, starch his shirts, scrub his bathroom, or perform any more tasks for him. Around that time, as punishment for Mother's errant behavior, Grandmother and Father began to confiscate Mother's personal possessions, such as small pieces of jewelry items, and clothing. In June 1999, Father took Mother's four-carat diamond engagement ring, telling her that she was no longer worthy of the ring, and replaced it with a small band with diamonds on it. In September 1999, after Mother commented to Father that "you and your mother do everything but sleep together," Grandmother punished Mother by making her get down on her knees on the floor of the utility room for two hours, and by making Mother give her ten items of clothing, as well as the clothes she was wearing. In November 1999, Father took Mother's eyeglasses as a punishment and never returned them.

Mother testified that, in light of the impending millennium, "Y2K," Father decided that the family should move to a rural area, far from a city. He purchased the farm near Waynesboro and obtained numerous items for survival, such as generators, fuel, freeze-dried food. Mother did not see the property before the family moved there in November 1999. The house had bedrooms in the basement, with living area and a bathroom upstairs. After the family moved to Tennessee, the punishments and deprivations grew graver still. Mother recounted that, in December 1999, Father directed her to stay in her bedroom in the basement and remain in isolation from their child and the rest of the family upstairs. Father would periodically bring her food and water and escort her upstairs to go to the bathroom. Mother said that her bedroom was not locked, but she was told not to open the door or there would be consequences. Mother said that she was afraid to try the door and leave the bedroom, even when Father and Grandmother had taken Eva Elisabeth out of the house on a day trip. She explained that they had told her that, if she did, the Holy Spirit would tell them, and she would never again be allowed back in the house and, consequently, would never again see Eva Elisabeth. While she was in isolation, Mother said, Father assigned her "neutralizing projects,"

ostensibly to get her to conform to his behavior standards. For example, Mother said, Father would write a statement and have her copy it 50 to 250 times. If she did not write to Father's satisfaction, she would be denied food and water and bathroom privileges. In order to earn food, Mother said, Father instructed her to write a book entitled "How I Destroyed My Marriage." Mother stated that Father told her to be creative, and that her "creativity and [her] skill was a determining factor in the upcoming meals and so [she] had to get real creative." Despite this, Mother remained in isolation. On one occasion her bed was taken away, and on other occasions she was denied food and water. Mother said that, despite her pleas, she was not permitted to see Eva Elisabeth on her first Christmas, and Father made her tear up a special gift that she had made for the child.

Mother said that on March 12, 2000, when Father became angry and told Mother to leave the house, she had no money, no car, did not know anyone and had no place to go. Consequently, Mother agreed to stay in the tenant house, that is, the Hill House, and abide by Father's rules. Mother testified that the windows of the Hill House were painted so that she could not see out, it had no hot water, and it had only a small refrigerator and a microwave. Mother slept on a cot, and Father brought her food and groceries once or twice a week. At no point was she permitted to see Eva Elisabeth. Finally, in April 2000, after Mother delivered to the main house the letter to Father asking to return, Father brought her the Bill of Divorcement and the Terms and Conditions of Divorcement, described above. She was then taken to Memphis and put on a bus to Branson, Missouri.

In her testimony, Mother explained the letters she wrote to Father in June and July of 2001, in the hope that Father had had a change of heart and would consent to reconciling. She claimed that she was in need of her relationship with Father and that she wanted their daughter to have contact with him also. Mother said, when she agreed to meet Father in the park, she did not know that Father was recording their meeting. Mother testified that Father came to the meeting with the wrong intent, and "he was able to get me to say what he wanted me to say and then misconstrued that and just tried to say that all of my testimony that I ever said in Court is a lie and that's just not true." Mother said, despite all that had happened, she would be willing to work with Father over his periods of visitation if she were given custody of Eva Elisabeth. In contrast, she said, when Eva Elisabeth was in Father's custody, he did not let Mother talk to her child.

Mother also testified about her situation at the time of trial. She said that she was living in a two-bedroom apartment in a gated community with a playground, where she intended for her and Eva Elisabeth to live. She asserted that she was able to care for Eva Elisabeth, and said that she had obtained full-time employment at a daycare facility earning $8.25 per hour. She testified that Eva Elisabeth stayed at the daycare when Mother worked at this job, which the child enjoyed.

Father testified next. In his testimony, Father did not disagree with Mother's recitation of many of the events that took place, but had a radically different view of how and why they occurred. He sharply disagreed with Mother's characterization of him as an anti-government religious extremist who, along with Grandmother, isolated, manipulated and controlled Mother. He testified that many of the actions that Mother said she was required to do were in reality actions that Mother decided to take. Others, he maintained, were a necessary response to Mother's violent, out-of-

control behavior. He admitted having strong, conservative Christian values, but adamantly denied being anti-government, an extremist, an isolationist, or a cult leader.

Father testified that, when he met Mother, she described living with her parents as a "life of living hell." At her request, he helped her escape that life, by helping her move out of her parents' home, finding her a place to stay, and getting her a job at Ellis Castle as Grandmother's assistant. When Mother began working at Ellis Castle, Father said, Mother and Grandmother developed a close relationship, such that Mother asked Grandmother to become her "mother," because her own mother had not cared for her. In response, Grandmother lavished attention on Mother, helped her plan the wedding, bought her wedding dress, and otherwise advised Mother on a variety of matters. Deciding not to invite Mother's parents to their wedding, Father said, was a mutual decision between Mother and him, and Mother was free to invite anyone she chose. Father testified that, prior to the marriage, he and Mother discussed at length their value systems, their beliefs on having a large family, home birthing, home schooling, and alternative medicine, and they were in full agreement.

Father testified that after they were married, Mother asked Grandmother to help her plan her days, and Grandmother helped create a schedule of "light housekeeping" for Mother. He said he never required Mother to do any housework. He said he did not instruct Mother to dress for dinner, although he allowed that Grandmother may have suggested it to help Mother be a good wife. Father said that he was thankful that Grandmother was there to be a good example for Mother. He said that he did not criticize or demean Mother, and that he never heard Grandmother criticize or demean Mother in any way. Neither he nor Grandmother restricted Mother's ability to use the telephone or socialize with others. Despite their support and assistance, Father testified, through negligence and clumsiness, Mother broke numerous household items, did not do well at household tasks such as cooking, and would frequently act wild, throwing tantrums and yelling.

Father testified that, after he and Mother married, she quickly developed a "bad attitude" and would act childish. He said that Mother would not sit still to have conversations with him, she was sullen about doing anything in the home, and she was never on time for dinner. Mother frequently became angry and would act wild and out of control. When Father sought to discuss his concerns with Mother, she would retort with "snippy negative comments," such as "I can't do anything right" or "I can't please you," and she would not reason with him in a normal tone of voice. Instead of accepting responsibility for her own actions, Father said, Mother blamed her parents or other circumstances for her problems. Other times, he said, she did things such as giving Grandmother some of her personal possessions, such as jewelry or items of clothing, to atone for her bad behavior.

Father testified that creating the Sixteen Promises in the summer of 1998 was Mother's idea, and that they were promises to the Lord, not to him. The 24 Family Ways, Father stated, were useful behavioral guidelines. He acknowledged that Mother memorized the Sixteen Promises and the 24 Family Ways, but said that neither he nor Grandmother ever required her to do so. Father claimed that he had never seen many of the documents written by Mother, but he admitted that he sometimes asked her to write "projects" as a result of her outbursts or tantrums. She would write for many hours a day. Regarding the "How I Destroyed My Marriage" essay, Father explained that it was

actually a book that Mother decided to write; although he had some input into the content, he mainly checked for grammar mistakes and the like. Father denied that either the writings or memorizing the Sixteen Promises or 24 Family Ways were related to whether Mother received food and water.

After Mother became pregnant, Father said, she never asked to see a doctor, so it was inaccurate for her to represent that she was "not allowed" to see a doctor. He claimed that Mother asked Grandmother to find a midwife, and that she asked Grandmother to be with her during the examinations and to ask questions on her behalf. He denied instructing Mother not to scream during childbirth. Regarding the birth certificate, Father said that he and Mother were in agreement that they did not want a birth certificate issued if it was not required, in order to protect their privacy, and that they did not want their child to be immunized. After Eva Elisabeth was born, Father complained, Mother was excessively affectionate towards her and constantly wanted the baby's attention, even when Father was holding the child.

Father admitted that he took Mother's four-carat diamond ring from her and replaced it with a diamond band, but explained that he did so because Mother had been harming herself, clawing her fingernails in her head, beating her head and pounding her temples, and he feared that she could hurt herself with the larger ring. Father stated that, when Mother was angry, she threw things, such as her Bible, pencils, paper, and anything she could get her hands on. Because of Mother's lying and her violent behavior, Father said, on April 13, 1999, he asked Mother never to do anything for him again, and asked her to sleep in the guest room and not to touch him.

Father claimed that, by December 1999, a few weeks after the family moved to Tennessee, Mother's violent behavior had escalated to the point where she could not be permitted to care for their daughter. Father denied that he "locked" her in her room, maintaining that there were no locks on the inside doors of the house. He admitted, however, that he asked Mother to stay in her bedroom and work on her "neutralizing projects." Father also said that Mother was never denied food or water or bathroom privileges. Father denied that Mother couldn't go upstairs; it was only required that she and Father agree for her to do so. When Eva Elisabeth was brought downstairs occasionally, such as to the laundry room, Father said, Mother chose to stay in her bedroom, working on her "neutralizing" writing projects. Father asserted that Mother never regained sufficient self-control to be allowed to see Eva Elisabeth; after that point, only Father and Grandmother took care of her.

According to Father, on March 12, 2000, Mother announced to him that she was leaving. Since she had no immediate place to go, Father allowed her to stay in the Hill House until she could make other plans. He explained that the windows of the Hill House had been painted because it had been used for storage, and the paint prevented passersby from seeing inside the house. He asserted that the house had hot water and that he visited Mother every day and brought her groceries. Father conceded that Mother was required to abide by a set of written rules while in the Hill House. He "believed" that she had to sign them and he allowed that "perhaps" the rules forbade Mother to waste water, food or electricity, to open any doors or windows, or to exit the house for any reason.

Predictably, Father's testimony differed greatly from Mother's on her delivery to the main house of her April 9, 2000 letter to him asking him to allow her to return to the main house. Father described her delivery as a screaming fit that he heard from several hills away. At that point, he said, he had had it. The same day, Father wrote the Bill of Divorcement and the Terms and Conditions of Divorcement, taking most of the factual information from his journal. Father said that the terms forbidding Mother from seeing Eva Elisabeth or from ever living in Texas or Tennessee were designed to keep Mother from hurting him, herself, or the child.

Father also testified that Mother's testimony at the January 2001 hearing was not a true reflection of their way of life. He said that Mother "painted a picture that was totally different from the reality of what" their lives were like. He argued that the admissions made by Mother at the secretly recorded July 2001 meeting at the park indicated that her prior testimony was untruthful.

Father testified about his current circumstances and ability to care for Eva Elisabeth. Father said that he had procured a job selling elementary school educational systems, on total commission rather than on salary. The trial court found that Father earned an average monthly income of $7,200, which Father did not dispute. Father built an addition to his home on the farm in Perry County, and he had more than adequate space for Eva Elisabeth to live with him and Grandmother.

Grandmother also testified at trial, corroborating and amplifying Father's testimony. She described Mother's public personality as "bouncy, platinum-haired, . . . happy, Marilyn Monroe look-a-like," but said, in reality, Mother is depressed, sullen, screaming, and self-mutilating. Grandmother stated that Mother asked her to be her mentor and her "mother." Grandmother said that, while they were in Texas, Mother called her four or five times every day at work asking Grandmother to come home because she was lonely.

Grandmother corroborated Father's testimony on numerous issues: (1) that Mother described living with her parents "a living hell;" (2) that Mother asked Grandmother to teach her hobbies such as embroidery and calligraphy; (3) that Grandmother encouraged Mother and did not criticize her; and (4) that Mother was never asked to perform household duties; and (5) that Mother agreed with Father to have a home birth, asked Grandmother to select a midwife, asked Grandmother to be with her during the visits with the midwife, and to "do the talking." Grandmother confirmed Father's description of Mother as angry and volatile, and agreed that she would frequently scream, throw fits, make comments of self-loathing such as "I'm an idiot" or "I hate myself," and commit acts of self-mutilation such as scratching her fingernails down her face or legs. Like Father, Grandmother maintained that Mother was never punished, only encouraged. She said that she and Father never required Mother to memorize items such as the "Sixteen Promises" or the "24 Family Ways;" rather, Mother required herself to memorize and recite them. Grandmother did not set out a schedule of household duties for Mother to perform; instead, Mother laid out her own schedule of household tasks. Grandmother asserted that Mother gave her some of her personal possessions such as jewelry and clothing; she said Mother told her she was doing it in order to remember not to misbehave. Grandmother maintained that Mother was not required to do her writing "projects" and that she was never required to stay in her bedroom, away from Eva Elisabeth; these were Mother's decisions and

Grandmother asserted that she in fact would encourage Mother to "come out of here . . . and be a part of the family." She said that Father brought Mother's meals to her room only to encourage her to eat. Grandmother agreed with Father that Mother moved out of the main house by her own decision, and that Father permitted Mother to live in the tenant house because she had no place to go. Grandmother said that, while Mother was residing in the Hill House, the only reason she did not come back to the main house was because she did not want to, and Grandmother did not bring Eva Elisabeth to the Hill House to see Mother because Mother "didn't even care about the baby; she was so into herself."[9]

Grandmother said that Father has a wonderful relationship with Eva Elisabeth. When Eva Elisabeth stays at their house on the farm, she and Father sing, play, collect eggs, and see the cows, horses, and dogs. Grandmother said that Eva Elisabeth does not want to go back to Mother's home when it is time to return. Grandmother testified that she would be available to care for the child in the event that Father was working or was out of town on business.

Vickie Hall, Mother's first midwife, testified about her experience with the family. She stated that, at her initial interview with the family, Grandmother asked all of the questions and Mother did not speak. Father told Hall he did not want a birth certificate to be filed, nor did he want any testing performed on Mother that would involve outside laboratories, explaining that he did not want State interference with his family. Hall said that, during the visits, Father several times referred to Mother as a "dumb blonde." Father refused to give Hall his home address or his home phone number, telling her that he would give her the information at the appropriate time. When Hall moved, she turned the case over to Gandy, the midwife who ultimately delivered the baby, and told Gandy that she was concerned that the family was overly secretive. Gandy's video deposition was played at trial. Like Hall, Gandy testified that Mother was always accompanied by Father and/or Grandmother at her prenatal visits, and that Father answered all questions that Gandy directed to Mother. Gandy also stated that Father told her that he did not want a birth certificate filed for the child because he wanted to avoid any government interference with his family.

Several experts either testified or submitted reports regarding the mental stability of the parties.[10] Dr. McMillan, the expert originally appointed by the trial court but later dismissed from his duties, evaluated both Mother and Father.[11] He evaluated Mother in December 2000, and concluded that Mother had a lack of self-identity and dependency needs that could cause her to be "manipulative, underhanded and tend to provoke situations in which she is pushed around and then blames others for her mistreatment." He further stated that, while Mother's personality style may cause her problems in parenting her child, the testing did not suggest any psychosis. Dr. McMillan described Father as "an emotionally cold man who deals with his world in an intellectual manner." He said that

---

[9]Grandmother did not refer to Father's journal during the marriage in which he claimed that Mother had made Eva Elisabeth the "sole object of her affection" or to Mother's letters to Grandmother apologizing for her excessive affection to the child, such as saying to her over and over, "Mommy loves you."

[10]We note only those opinions that are relevant to the issues in this appeal.

[11]Dr. McMillan did not testify at trial, but his reports were included in the record.

Father tends to view people as objects to be manipulated to satisfy his goals, and concluded that Father "is lacking in the deep emotional resources that are necessary to raise a psychologically healthy child."

William D. Kenner, M.D. ("Dr. Kenner"), was employed by Mother. Dr. Kenner concluded that Mother suffered from a reactive disorder resulting from her experience with Father. He determined that the Bill of Divorcement written by Father "demonstrates the father's difficulty in allowing anyone to have opinions that are in variance with his." He observed that requiring someone to memorize codes such as the Sixteen Promises and 24 Family Ways is the type of behavior that occurs in the recruitment and training of individuals within cults. Dr. Kenner felt that Father's rigid religious beliefs would interfere with his ability to parent the child.

Joseph Labarbera, Ph.D. ("Dr. Labarbera"), was hired by Father. Dr. Labarbera's evaluation was favorable to Father, but incomplete. Dr. Labarbera determined that Father had no emotional instability nor problems with authority or dominance of others. He believed that Father was a bit idealistic and somewhat naive, and may avoid unpleasant realities by not dealing with them. He found nothing that would diminish Father's ability to parent his daughter.

Evelyn Frye, Ph.D. ("Dr. Frye"), who testified at trial, was employed by Father and interviewed both Mother and Father. Dr. Frye diagnosed Mother with a borderline personality disorder, based in part on her review of some of the documents that Mother had written before and during her marriage and concluded that they showed extreme views on certain subjects. In Dr. Frye's opinion, Mother would not be able effectively to parent her child.

Dr. Frye noted that Father has a histrionic style, viewed the world idealistically, was a perfectionist and had an obsessive-compulsive nature. Nevertheless, Dr. Frye's testing showed that Father was "warm, friendly, and sympathetic." At trial, she stated that the Bill of Divorcement drafted by Father corresponded to the facts noted in his journal, and that it was an attempt by Father to justify the breach of the marriage commitment, which he would not do lightly because of his belief system. Dr. Frye concluded that there was no reason why Father could not effectively parent the child.

In addition, several lay witnesses testified at trial on behalf of both Mother and Father. These witnesses testified about the parties' character and ability to parent their child. The testimony concluded on March 18, 2003.

## IV. TRIAL COURT DECISION

On May 9, 2003, the trial court issued its memorandum opinion. In it, the trial court set forth detailed findings of fact, reflecting a careful and balanced review of the testimony and evidence. The trial court found that Mother had had a "strained" relationship with her family, and that Father "reinforced this tension" by encouraging her to cease any communication with her family. After the marriage, the trial court found, Father was "unyielding" in his expectation that Mother perform the

traditional duties of a homemaker "to perfection," and that Mother was immature and fell far short of his expectations. The trial court observed that Father "treated [Mother] as a child, and she responded in kind." When Mother became upset or "threw a tantrum," the trial court found, she was punished by Father and Grandmother by being required to memorize and recite codes such as the "Sixteen Promises" and the "24 Family ways" and by giving them her engagement ring and possessions such as clothes. It found that, after Mother became pregnant, Father and Grandmother declined recommended laboratory tests and would not permit the midwife to meet privately with Mother.

After a time, the trial court found, Father disciplined Mother by discontinuing sexual relations and by requiring her to stay in her room and "work on her neutralizing projects." The trial judge found that Mother was not permitted to see her daughter after December 7, 1999, even on Christmas Day. It concluded that Father moved Mother to the tenant house in March 2000 and required her to abide by his written rules, which included not opening the doors or leaving the house for any reason. In April 2000, in violation of Father's rules, Mother went to the main house and left a letter for Father. After this, the trial court found, Father wrote up the "Bill of Divorcement" and the "Terms and Conditions of Divorcement," whereby he purported to grant himself a divorce and forbid Mother from ever again seeing their daughter, and then put her on a bus to Branson, Missouri.

Based on these findings of fact, the trial court granted Mother a divorce on the ground of inappropriate marital conduct. In its division of the marital property, the trial court awarded Father the farm in Tennessee and his vehicle as separate property, and ordered Father to return to Mother her wedding and engagement rings. The trial court designated Mother as primary residential parent for the parties' child, granted Father regular residential parenting time, and ordered him to pay Mother child support of $1,512 per month. The trial court denied any rehabilitative alimony award to Mother based on the short duration of the marriage, Mother's young age, and the fact that Mother was employed. On the issue of attorney's fees, the trial court estimated that Father had spent over $300,000 to fund this "extensive litigation," and that Mother had spent over $100,000 in fees and expenses. Although the trial court found that Father was at fault for filing numerous questionable pleadings, it found that Mother also contributed to the cost of the litigation through her exaggerations in court before Judge Heldman, resulting in Father's restricted visitation. In light of this, the trial court awarded Mother attorney's fees of only $60,000. On May 28, 2003, the trial court entered a final decree of divorce, consistent with the findings in its memorandum opinion. On July 2, 2003, the trial court held a hearing on the issue of certain discretionary costs.[12] Subsequently, the trial court entered an order awarding Mother approximately $40,097 in discretionary costs for court reporter fees and video recording devices ($11,820.51), expert witness fees ($26,175), and real estate appraisal costs ($2,102). Father now appeals the trial court's decision.

---

[12]In the hearing, the trial judge clarified that Mother could not recover fees for her experts' preparation for deposition or trial, no matter how reasonable or necessary the costs were. *See Mass Mut. Life Ins. v. Jefferson*, 104 S.W.3d 13, 38 (Tenn. Ct. App. 2002).

## V. ANALYSIS

On appeal, Father challenges the trial court's decision to (a) designate Mother as the primary residential parent; (b) grant Mother a divorce based on Father's inappropriate marital conduct; © award Mother $60,000 in attorney's fees; and (d) award Mother over $40,000 in discretionary costs. Though Father makes several points in his argument on appeal, his overriding contention is that the trial court did not adequately take into account Mother's admission in the secretly recorded meeting that she misled the trial court and exaggerated her testimony at the January 2001 hearing in order to obtain immediate custody of the child. In light of Mother's admitted untruthfulness, Father argues, the trial court should have ruled in his favor on all of the issues raised in this appeal.

We review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the preponderance of the evidence is otherwise. We review the trial court's conclusions of law *de novo*, with no such presumption of correctness. ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984); ***Vaccarella v. Vaccarella***, 49 S.W.3d 307, 311 (Tenn. Ct. App. 2001).

We first address Father's argument that the trial court erred in designating Mother as primary residential parent. A trial court's decision on the custody of a child is "among the most important decisions confronting a trial court in a divorce case." ***Rice v. Rice***, No. M1998-00973-COA-R3-CV, 2001 WL 812258, at *2 (Tenn. Ct. App. July 19, 2001). In such a decision, the needs of the child are paramount, and the desires of the parents are secondary. ***Id.*** The inquiry is necessarily fact driven, and the trial court must take into consideration all of the facts and circumstances of the case in reaching its conclusion. ***Nichols v. Nichols***, 792 S.W.2d 713, 716 (Tenn. 1990), ***overruled on other grounds***, 924 S.W.2d 623 (Tenn. 1996). In choosing which parent to designate as the primary residential parent for the child, the court must conduct a "comparative fitness" analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other. ***Bah v. Bah***, 668 S.W.2d 663, 666 (Tenn. 1983). In engaging in this analysis, the court must consider the factors set out in Tennessee Code Annotated § 36-6-106(a).[13] Trial courts have broad discretion

---

[13] (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1- 602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(continued...)

-21-

in making custody determinations, but those determinations must be based on the proof at trial and the applicable principles of law. *Rice*, 2001 WL 812258, at *2 (citing *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995)). The decision frequently hinges on the credibility of the witnesses at trial, a matter that is within the sound discretion of the trial court; consequently, appellate courts are loathe to second-guess a trial court's conclusion. *Id.*; *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). With these principles in mind, we turn to the trial court's decision in this case.

In its memorandum opinion, the trial court explicitly analyzed the factors relevant to its decision. The trial court first noted its concern about Father's aversion to traditional healthcare, and stated that Father's failure to take the child to a physician or obtain health insurance for the child was not in her best interest. The trial court observed that Father preferred home schooling, while Mother favored traditional forms of school. It reasoned that, while both approaches are acceptable, as a practical matter, socialization with peers would be difficult if the child were being home schooled while living on Father's farm in Perry County. The trial court found that family stability weighed in favor of Father, because he and Grandmother had maintained a stable household for many years, while Mother had no immediate family to support her in Tennessee. Though the parties each challenged the other's mental stability, the trial court determined that neither party suffers from a mental disorder. The trial court found that Father "is a controlling person and reacts poorly when

---

[13](...continued)

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2001).

things do not go his way. The Court cannot ignore the vindictiveness demonstrated by [Father] in his 'scorched earth' approach to anyone who opposed him." The trial court noted the frivolous federal lawsuit filed by Father as "a prime example of this intolerance and vindictiveness." However, the trial court determined that Mother was "extremely immature, inexperienced and self-centered" at the outset of the marriage, and "was clearly anxious and depressed throughout her marriage to [Father] and the ordeal she suffered through when she was expelled by [Father] from the family's home." The trial court found, however, that over time Mother had significantly improved in this regard.

The most important factor on which the trial court relied in designating Mother as primary residential parent was that Mother was more willing to facilitate and encourage a close and continuing parent-child relationship between Eva Elisabeth and Father. The trial court found that Father's act of isolating Mother from the child beginning in December 1999 was "unconscionable," and that "[s]eparating an infant from her mother is never in the child's best interests unless there is abuse of the child, which is not a factor in this case." The trial court determined that Father's statement in the "Terms and Conditions of Divorcement," purporting to force Mother to agree to never again see her daughter, showed clearly that his intent was never to again allow Mother to see or communicate with Eva Elisabeth. The trial court observed that this intent was further underscored by Father's subsequent refusal to allow Mother to see Eva Elisabeth from December 1999 until she obtained custody in October 2000.

The trial court directly addressed Father's assertion that he should be awarded custody because of Mother's "perjury" in the preliminary proceedings before Judge Heldman. During the trial, the trial judge offered the parties his impression of the secret recordings of Mother and Father in the park. The trial court commented:

> I was listening for the points that you wanted me to listen to. I just told you that one of my impressions was that you all did well together. . . . I also had another impression in that you [Father] clearly led the conversation where you wanted it to go. You at times put words in her mouth. That's my impression and there are also times when she clearly admitted that she misled the Court. So it's a mixed bag. My impression never having heard the tape based on what your lawyer kept standing up and hollering about every time he's walked in the courtroom was that [Mother] was going to come on this tape and say something like "Boy, I fixed you on that court. I taught you a lesson. I made up these great stories about you and I got you now, big guy." . . . But that's not really what – that didn't happen.

In its memorandum opinion, the trial court noted that, in the secret recording of the meeting between the parties in the park, Mother admitted to misstating certain facts and misleading the court by her exaggerations. The greater significance of the secretly recorded meeting, the trial court found, was to show "the manner in which the parties interacted with one another. [Father] immediately began to treat [Mother] as a child, and for her part, [Mother] immediately began to assume child-like characteristics as she interacted with her husband." The trial court remarked that, although Father had filed a complaint for perjury against Mother and her attorney with the local police department, the

district attorney refused to prosecute them. With respect to the designation of the primary residential parent, the trial court reasoned that, "[w]hile perjury is a serious offense, aimed at the integrity of the Court, there may be circumstances where the best interest of the child is more important." It allowed that, while Mother exaggerated some of the circumstances about which she testified, the facts which she exaggerated did not affect his analysis of the best interest of the child. The trial court noted that Mother's misstatements to the court would be dealt with in the award of attorney's fees. Weighing all of these factors, the trial court designated Mother as the primary residential parent of Eva Elisabeth.

Father's argument on appeal relies on his claim that the trial court failed to take into consideration Mother's deceitful conduct, illustrated by the admitted exaggerations in her preliminary testimony before the trial court in January 2001. We find, however, that the trial court took this into account and gave it appropriate weight. As the trial court noted, the topics about which Mother exaggerated related to issues such as (a) whether there were locks on the doors in the parties' homes; (b) whether Father encouraged Mother to wear her hair like Grandmother's; © whether Mother was permitted to invite guests to her wedding; and (d) the description of the farm as a "compound" and Father as a "cult" leader. The trial court's decision, however, was based on much more significant facts, such as whether Father, without valid reason, decided to shut Mother away from Eva Elisabeth and ultimately to prevent Mother from ever seeing their daughter again. While Father may not have admitted any falsehoods, the trial court clearly found not credible his implausible assertions, dutifully corroborated by Grandmother, that Mother freely chose, indeed initiated, actions such as writing, memorizing and reciting elaborate codes of conduct, closeting herself in her bedroom away from her infant daughter in favor of engaging in "neutralizing projects," that is, writing over and over for hours statements apologizing for transgressions, and finally voluntarily leaving the home in which her infant daughter lived in order to stay alone on a cot in a tenant house with painted-over windows. The facts as found by the trial court are overwhelmingly supported in the record and go to the very heart of Father's comparative fitness as a parent. Therefore, we conclude that the trial court appropriately weighed all of the relevant factors and affirm its decision to designate Mother as the primary residential parent of the parties' child.

Father argues next that the trial court erred in granting Mother a divorce based on Father's inappropriate marital conduct. He claims that, because Mother recanted many of her claims of abuse during the secretly recorded July 2001 meeting with Father, then the trial court's finding of inappropriate marital conduct is not supported by a preponderance of the evidence. He asserts that the evidence regarding Mother's actions during the marriage – including her frequent tantrums, wild behavior, self-mutilation, threats of suicide, "breaking her word over and over," and disturbing the child with her outbursts – constitute grounds on which *he* should be granted a divorce based on *her* inappropriate marital conduct.

Both parties in this case alleged that the other was guilty of inappropriate marital conduct. Inappropriate marital conduct can be found when "[t]he husband or the wife is guilty of such cruel and inhuman treatment or conduct towards the spouse as renders cohabitation unsafe and improper . . . ." Tenn. Code Ann. § 36-4-101(11) (2001); *see Eldridge v. Eldridge*, 137 S.W.3d 1, 23-24 (Tenn.

Ct. App. 2002). Thus, inappropriate marital conduct is established when "either or both of the parties [have] engaged in a course of conduct which (1) caused pain, anguish or distress to the other party and (2) rendered continued cohabitation 'improper,' 'unendurable,' 'intolerable,' or 'unacceptable.'" *Eldridge*, 137 S.W.3d at 24 (quoting *Earls v. Earls*, 42 S.W.3d 877, 892 (Tenn. Ct. App. 2000) (Cottrell, J., concurring)). By statute, the trial court is vested with the discretion to grant a divorce to the party who was less at fault. Tenn. Code Ann. § 36-4-129 (2001).

In the instant case, both Mother and Father sought to prove that the other party was guilty of inappropriate marital conduct. While the trial court did not accept wholesale either party's contentions, the findings of fact in the memorandum opinion clearly reflect an implicit determination that, overall, Mother's version of the events was the more credible of the two. Whether one party or another should be awarded a divorce on grounds of inappropriate marital conduct is often determined by a trial court's credibility assessment. *Eldridge*, 137 S.W.3d at 24. "In a case where the resolution of the issue[] depends upon the truthfulness of the witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues." *Fann v. Fann*, W2000-02431-COA-R3-CV, 2001 WL 394858, at *2 (Tenn. Ct. App. Apr. 18, 2001). Therefore, we accord great deference to the trial court's assessment of the parties' credibility.

In this case, with appropriate deference to the trial court's determinations of credibility, there was ample evidence in the record to support the trial court's decision to award the divorce to Mother. Indeed, given the evidence, the trial court's findings regarding Father were charitable. Going into the marriage, Mother was obviously immature, suggestible, needy, and impulsive, while Father was controlling, dogmatic, and intolerant. These alone were daunting obstacles to overcome, but the active participation of Grandmother as the third prong in the relationship doomed the marriage, setting up a dynamic in which Father and Grandmother combined first to indoctrinate Mother and then to methodically humiliate, ostracize, and subjugate her. The trial court rejected Father's assertions to the contrary, and found that he engaged in an egregious course of conduct which warranted a finding that Father was more at fault for the demise of the marriage. The preponderance of the evidence clearly supports the trial court's award of the divorce to Mother, and this decision is affirmed.

Father next argues that the trial court erred in granting Mother $60,000 in attorney's fees. He argues that Mother's documentation of her legal fees is inadequate, and that Mother's dishonesty in misleading the court created the need for a substantial portion of the legal fees incurred by both parties and resulted in Father's "costly effort to regain his right to visitation with his daughter." An award of attorney's fees is within the trial court's sound discretion, and we will not overturn its decision absent a clear abuse of discretion. *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995). An abuse of discretion occurs when a trial court "either applie[s] an incorrect legal standard or reache[s] a clearly unreasonable decision, thereby causing an injustice to the aggrieved party." *Kline v. Eyrich*, 69 S.W.3d 197, 203-04 (Tenn. 2002).

When determining whether attorney's fees are reasonable, a trial court must consider the factors enumerated in ***Connors v. Connors***, 594 S.W.2d 672, 677 (Tenn. 1980), and in Tennessee Supreme Court Rule 8, Disciplinary Rule 2-106(B).[14] The factors set out in ***Connors*** include the time devoted to performing the legal service; the time limitations imposed by the circumstances; the novelty and difficulty of the questions involved; the skill requisite to perform the legal service properly; the fee customarily charged in the locality for similar services; the amount involved and the results obtained; and the experience, reputation, and ability of the lawyer performing the legal service. ***Connors***, 594 S.W.2d at 676. The Supreme Court Disciplinary Rule 2-106(B) lists similar, but not identical, criteria:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

---

[14]We cite the former Code of Professional Responsibility because it was in effect during the course of the litigation in the trial court below. We note, however, that similar provisions exist in the current Rules of Professional Conduct, which became effective March 1, 2003. Rule 1.5 of the Rules of Professional Conduct closely mirrors Disciplinary Rule 2-106 and provides:

> Fees.--(a) A lawyer's fee and charges for expenses shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
>
> > (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> >
> > (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> >
> > (3) The fee customarily charged in the locality for similar legal services;
> >
> > (4) The amount involved and the results obtained;
> >
> > (5) The time limitations imposed by the client or by the circumstances;
> >
> > (6) The nature and length of the professional relationship with the client;
> >
> > (7) The experience, reputation, and ability of the lawyer or lawyers performing the services;
> >
> > (8) Whether the fee is fixed or contingent;
> >
> > (9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
> >
> > (10) Whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5 (2004).

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) Whether the fee is fixed or contingent.

The reasonableness of an attorney's fee will depend upon the circumstances of the particular case in light of the relevant factors. *White v. McBride*, 937 S.W.2d 796, 800 (Tenn. 1996). "A fee is clearly excessive if 'after review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee' " *Fell v. Rambo*, 36 S.W.3d 837, 852 (Tenn. Ct. App. 2000) (quoting Tennessee Supreme Court Rule 8, DR 2-106(B)).

In this case, Father argues that Mother failed to provide sufficient documentation to establish her right to any amount of an attorney's fee. He points out that Mother submitted two affidavits of attorney Roger Reid Street, who represented Mother both before and during the trial. Street's affidavits summarily stated that he represented Mother for a total of 310.2 hours at a rate of $185 per hour, for a total fee of $57,387. The first affidavit included no itemization, but the second included an attached document giving a very brief description of the work performed. To establish the fees of her previous counsel, Robert Todd Jackson and Gregory Tibbets, who represented Mother through August 2001, Mother simply submitted a sheet listing their monthly charges, which totaled $30,000 and $17,000, respectively. In the absence of proof regarding the reasonableness of those fees, Father argues, the trial court erroneously awarded Mother 60% of the fees she requested.

Tennessee law, however, does not require detailed expert testimony regarding attorney's fees to support an award in an amount that the court deems reasonable. Under Tennessee caselaw, "a trial judge may fix the fees of lawyers in causes pending or which have been determined by the court, with or without expert testimony of lawyers and with or without a prima facie showing by plaintiffs of what a reasonable fee would be." *Cain v. Cain*, W2003-00563-COA-R3-CV, 2004 WL 404489, at *2 (Tenn. Ct. App. Mar. 3, 2004) (quoting *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn. 1988)). A trial court may judge the value of the fees by having participated in the proceedings before it. *Richards v. Richards*, M2003-02449-COA-R3-CV, 2005 WL 396373, at *15 (Tenn. Ct. App. Feb. 17, 2005). Thus, the deficiency in the proof for lack of adequate description of the services provided, standing alone, is not an adequate basis on which to find that a trial court abused its discretion in awarding the fees claimed. In this case, there is no proof in the record that the fees claimed by Mother were unreasonable, either because of the hours spent or because of the hourly rate. Indeed, the trial court estimated that Father's own attorney's fees exceeded $300,000, three times the amount claimed by Mother. In applying the *Connors* factors and the factors

enumerated in DR 2-106(B), it becomes apparent that the time, labor, difficulty of the issues, and the results obtained all weigh in favor of the reasonableness of the claimed fee. Furthermore, Mother is the primary caretaker of the parties' child, receives only $1,512 per month in support, no alimony, and received no major assets in the divorce. Mother's clear inability to pay her fees weighs in favor of the trial court's award. Under all of these circumstances, we find that the trial court did not abuse its discretion in making an award to Mother of $60,000 of her claimed fees.[15]

Father argues that the trial court erred in granting Mother $40,092 in discretionary costs, because this total included costs that were not recoverable under Rule 54.04 of the Tennessee Rules of Civil Procedure. Father takes particular issue with respect to the $20,325 fee awarded to Mother for services provided by Dr. Kenner. "Pursuant to Rule 54.04, trial courts are vested with wide discretion in awarding discretionary costs, and this court will not interfere with such an award except upon an affirmative showing that the trial court abused its discretion." *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998). Though the prevailing party is ordinarily awarded costs and fees, the prevailing party is not automatically entitled to such fees. Rather, costs should be apportioned as the equities of the case demand. *Id.* The party challenging the trial court's award bears the burden of showing that the trial court abused its discretion in the assessment of costs. *Id.*

In her motion for discretionary costs, Mother listed all of the costs of litigation, including a list of expert fees that she claimed were recoverable under Rule 54.04(2). Mother included Dr. Kenner's $22,040.25 fee along with the other expert fees, claiming entitlement to the fees because they were "professional fees [that] were expended in the prosecution of this case." The motion indicated that Dr. Kenner's fee was for work performed from February 27 to October 18, 2002, but the type of work performed was not described. Mother further submitted the affidavit of her attorney, which stated that the fees reflected in the motion were "reasonable and were necessarily incurred by [Mother] in proving her claims asserted in this case," without any further description or explanation.

On July 2, 2003, the trial court below conducted a post-trial hearing on Mother's motion for discretionary costs. At the hearing, counsel for Father argued that, under Tennessee Rule of Civil Procedure 54.04(2), recovery for expert fees is limited to fees for time spent in deposition or trial testimony, and does not include time spent in preparation for such testimony. He pointed out that Mother's motion did not identify how much of the expert's fee was for actual trial or deposition testimony, and argued that, from the claimed amount of Dr. Kenner's fee, it was obvious that his fee included charges for trial preparation. The trial court agreed that Mother could not be awarded costs for Dr. Kenner's time spent in preparation for his testimony. Counsel for Mother conceded his failure to identify the type of work performed by the experts, and stated that he would provide that information to the trial court. The trial court determined that it would consider Mother's motion for recovery of expert fees only after counsel for Mother had an opportunity "to go through the bill and pull out what you consider to be expenses for the deposition itself, or the trial testimony itself, and if you provide those to [counsel for Father], then he can see what you're talking about." Counsel for

---

[15]Mother does not challenge the trial court's discounting of her fees by $40,000.

Father suggested that "[a]fter they're submitted we'll discuss it as to whether a further hearing is necessary by agreement."

The record does not show that there was a further hearing, and does not indicate whether Mother submitted further records to support an award for expert fees. Nevertheless, on July 23, 2003, the trial court entered an order granting Mother's motion for discretionary costs, including a fee of $20,325 attributable to Dr. Kenner. Notably, the trial court's award for Dr. Kenner's fee was $1,715.25 less than the amount originally requested by Mother, but the order does not explain the reason for this discrepancy. Indeed, the trial court stated in its order that the expert fees were for "depositions, *trial preparation*, trial attendance and testimony," and does not indicate what portion of the amount awarded was for preparation as opposed to testimony. In any event, the trial court awarded Mother the majority of the fees requested for Dr. Kenner's services.

In *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13 (Tenn. Ct. App. 2002), this Court recognized that Tennessee Rule of Civil Procedure 54.04(2) limits the types of expert witness fees that can be recovered as discretionary costs by the prevailing party. *Mass. Mut.*, 104 S.W.3d at 38. Ironically, the same Dr. Kenner that testified in the trial court below testified as an expert in *Massachusetts Mutual* to evaluate the defendant's disability claim. *See id.* at 24 n.13. The plaintiff prevailed at trial and sought, among other things, $15,606.50 in expert fees for Dr. Kenner's services. The trial court denied that request, and the plaintiff appealed. On appeal, the appellate court noted that, pursuant to Rule 54.04(2), "[o]nly 'reasonable and necessary expert witness fees for depositions and trial' are recoverable. Thus, prevailing parties cannot recover expert witness fees for preparing for depositions or trial, no matter how reasonable and necessary those fees are." *Id.* (quoting Rule 54.04(2)). The appellate court affirmed the trial court's denial of discretionary costs attributable to Dr. Kenner's fees, stating:

> First, much of his fee plainly involved non-recoverable trial preparation services. Second, the affidavit supporting the motion to assess discretionary costs does not identify which of Dr. Kenner's many fees represented his fee for attending the trial. Accordingly, Massachusetts Mutual has failed to demonstrate that it is entitled to reimbursement for any portion of Dr. Kenner's fees.

*Id.* at 39. Thus, because the prevailing party did not submit sufficient evidence to show which portion of Dr. Kenner's fees were trial preparation and which were deposition and trial testimony, the appellate court affirmed the trial court's denial of those fees.

In the instant case, the trial court granted Mother fees for work performed by Dr. Kenner, Dr. Frye, and Dr. Jay Woodman, Ph.D., stating that the award was for expert witness fees incurred "as a result of depositions, trial preparation, trial attendance and testimony."[16] Although the trial court

---

[16] The trial court awarded $1,050.00 for Dr. Frye, which was the amount claimed by Mother, and $4,800.00 for Dr. Woodman, which was $784.00 less than the amount claimed by Mother. The trial court disallowed the other

(continued...)

reduced the fees claimed by $1,715.25, the record does not indicate how the trial court distinguished among the various charges by Dr. Kenner. On appeal, Father must show that there was "no equitable basis" on which to support the trial court's apportionment of costs. ***See Guzman v. Alvarez***, No. M2003-02902-COA-R3-CV, 2005 WL 1634084, at *3 (Tenn. Ct. App. July 12, 2005).

We recognize that Rule 54.04(2) allows for recovery of "reasonable and necessary expert witness fees for depositions . . . and for trials," and that "trial preparation services" are not recoverable under the Rule. ***Mass. Mut.***, 104 S.W.3d at 39. It is undisputed that at least some of Dr. Kenner's fees are recoverable under Rule 54.04(2). Father asserts that Dr. Kenner testified for only about two hours at trial, while Mother claims that Dr. Kenner spent at least ten hours on "court time." From this record, we cannot discern what portion of the award for Dr. Kenner's fee, if any, was attributable to trial preparation. This issue is best resolved by the trial court. Therefore, we vacate the award of Dr. Kenner's fee, and remand the matter to the trial court to award expert fees for Dr. Kenner's services only for items which are permissible under Rule 54.04(2).

With respect to all other discretionary costs awarded to Mother, Father has not carried his burden to show that the trial court abused its discretion. Therefore, we affirm the trial court's award of costs and fees except with respect to the fees of Dr. Kenner.

Finally, Mother argues that she is entitled to attorney's fees on appeal. An award of appellate attorney's fees is a matter within this Court's sound discretion. ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). "When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case." ***Darvarmanesh v. Gharacholou***, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). Under all of the circumstances of this case, we grant Mother's request for attorney's fees for this appeal. The cause is remanded to the trial court for a determination of the reasonable amount of such fees.

The decision of the trial court is affirmed, except that we vacate the award of costs for Dr. Kenner's fees. The cause is remanded for a determination of the appropriate amount of costs for Dr. Kenner's fees, as well as Appellee's attorney's fees for this appeal. Costs on appeal are to be taxed to Appellant Marcus Ellis, and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

16(...continued)
professional fees claimed by Mother. In total, Mother claimed $37,904.25 for professional fees, and the trial court granted her request only as to $22,159.00, disallowing a total of $15,745.25 in such fees.