# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 20, 2012 Session

## JEREMY DATHAN PORT v. VERONICA L. HATTON

**Appeal from the Chancery Court for Rutherford County**
**No. 10CV1406      Royce Taylor, Judge**

**No. M2011-01580-COA-R3-CV - Filed March 6, 2013**

The trial court granted the parties a divorce, named the father as the primary residential parent of their one and a half year old child, and permitted him to return with the child to North Carolina, where both parties originally came from and where their families still resided. The mother was granted three days of supervised visitation with the child each month in North Carolina. She argues on appeal that the trial court's decision was flawed because the court failed to analyze the best interest of the child in accordance with the appropriate statutory factors. She also argues that by allowing Father to take the child to North Carolina and limiting her visitation so severely, the court deprived her of her right to maintain the parent-child relationship, and that its actions were inconsistent with case law stating that "the least restrictive visitation limits are favored in order to encourage the parent-child relationship." We affirm the trial court's designation of the father as the primary residential parent, and its finding that it was in the child's best interest that the father be permitted to relocate with the child. We also affirm the parenting plan.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Cherie Cash-Rutledge, Murfreesboro, Tennessee, for the appellant, Veronica L. Hatton.

Joe M. Brandon, Jr., Laurie Young, Murfreesboro, Tennessee, for the appellee, Jeremy Dathan Port.

## OPINION

### I. MARRIAGE, PARENTHOOD, SEPARATION AND CONFLICT

Jeremy Dathan Port ("Father") and Veronica Lee Hatton ("Mother"), married in 2009 in their home state of North Carolina. Prior to their marriage, Father, a military veteran, worked as an optical technician for four or five years. He then became part-owner of a small bar and worked construction. Father and Mother met when she was hired to sing karaoke in Father's bar. Mother and Father moved to Nashville in September or October of 2009, because Mother wanted to pursue a music career. Mother was pregnant with the parties' child at the time of the move. She gave birth to a son, Jeremy Dathan Port, II, on December 4, 2009.

The proof showed that the relatives of both Mother and Father live in or around Raleigh, North Carolina , and that the parties have no family members in the Nashville area. Father testified that he did not want to come to Nashville, but that Mother was determined to make the move, and "I didn't have a choice in the matter." So Father accompanied his wife to Nashville in order to be able to protect her and their as-yet unborn child.

The couple moved into a mobile home in Smyrna that had been purchased for them by Mother's grandparents. Father and Mother both found jobs at a Cracker Barrel restaurant to support themselves. After their baby was born, Father worked full-time, and Mother worked from one to three days per week. Unfortunately, the parties experienced frequent marital conflict.

During this time, both parties sought orders of protection and restraining orders based on alleged misconduct by the other party. The proceedings resulting from those filings were heard in Chancellor Corlew's court. He appointed a Special Master on September 23, 2010, to sort out the conflicting allegations. The record indicates that the Special Master conducted a two-hour hearing and awarded joint custody of the child to both parents, with Mother to have him four days of each week, and Father to have him for three days. However, neither the Master's report nor the order resulting from it are to be found in the record.

On December 16, 2010, Father filed an Emergency Motion for Temporary Custody of the child, accompanied by a detailed affidavit. He claimed that recent events led him to fear for the welfare and safety of his son and of himself. His allegations included that Mother had indulged in episodes of violent rage in the presence of the child; that she had neglected to care for the child while she was intoxicated; that she left the child for extended periods of time in urine-soaked diapers; and that she failed to appear for scheduled exchanges of the child, likewise because of intoxication.

On December 21, 2010, Chancellor Corlew conducted a hearing on Father's motion during which both parties testified. He entered an order on January 5, 2011 granting temporary custody of the child to Father with limited visitation time for mother, 1:00 p.m. to 4:00 p.m., twice a week, with exchanges of the child to take place inside the lobby of the Smyrna Police Department. The court found that "the evidence presented demonstrates a cause for concern," and that "there was proof and an admission by Mother regarding alcohol consumption."

## II. DIVORCE PROCEEDINGS

Father filed a complaint for divorce on September 10, 2010. The divorce proceedings were heard by Chancellor Taylor and were docketed with a different case number from the proceedings heard by Chancellor Corlew. The two actions advanced simultaneously and separately until they were consolidated in February of 2010. All further proceedings were then heard by Chancellor Taylor.

Father's divorce complaint alleged that Mother was an alcoholic, that she was addicted to illegal drugs, that she neglected the child, and that she was mentally unstable. He accordingly asked the court to designate him as the child's primary residential parent. Mother answered and filed a counter-claim for divorce in which she denied Father's allegations and asked to be named as the child's primary residential parent. On February 18, 2011, Father filed a motion to be allowed to amend his complaint to include a request that he be allowed to relocate with the child to Raleigh, North Carolina. The trial court granted the motion to amend.

Father testified that Mother's behavior made him doubt her willingness to adequately care for their young son, and sometimes even made him fear for the child's safety. On one occasion, Mother called Father while he was at work to tell him that baby had fallen. He left work right away, came home and took the baby to the hospital. Fortunately the baby was not injured. Asked about this incident, Mother said that the baby just fell out of her arms, and that the doctor told her it was not an unusual happening, because "people do that all the time."

According to Father's testimony about the period prior to the parties' separation, on his days off from work he would usually do the laundry, clean the house and cook. On work days, Mother sometimes failed to pick Father up at the end of his shift as previously agreed. When he got home, he would sometimes find that she was intoxicated and the baby was left unattended in a wet diaper. "I remember working 13 hours one day and I came home and I opened the door and it billowed out marijuana smoke, and I had to step back. If that stuff is on me and I get hurt at work – you know, when you have a child, you've got to change,

period." Father testified that after he got home from work, Mother often left the trailer to visit neighbors, carrying her makeup bag. When he looked inside that bag, he found tweezers, pipes, rolling papers and marijuana.

Father also testified to several incidents of irrational behavior by Mother during that same period. According to his account, he refused to drink some Gatorade one evening because it gave him heartburn, and Mother woke him up at 2:00 or 3:00 in the morning and forced him to drink it, because she had somehow become convinced that he was trying to poison her. Another evening, Father and Mother were lying in bed with the baby between them, and Mother reportedly said, "the devil is telling me to harm the child." Father was understandably alarmed, and he urged her to go to a doctor because it was clear to him that she needed help.

Father knew that Mother was taking the anti-depressant Paxil, and he wondered whether the combination of that drug with alcohol and marijuana was causing her mental symptoms. When Mother took the stand, she acknowledged that she had been taking the drug since April of 2010. She was asked what it was for, and she said it was because she was in an abusive relationship and suffered from mild mixed depression and anxiety. She also stated that "I'm not going to be drinking a lot because of the medication that I am taking." She denied that the drug came with an unequivocal warning about combining it with alcohol.

After the parties separated, Kim Christian, one of Father's co-workers, invited him to share her three bedroom home with her husband and daughter on a temporary basis because he had no other place to go. She testified that he never used alcohol or drugs while he was there, that he always went to work on time, that he paid rent and that he never did anything inappropriate. She also testified that he was "an awesome parent," and that although she sometimes helped him with child care, he bathed and fed and changed his son when he was there, and that Father and child were very closely bonded.

Father subsequently moved into a mobile home in LaVergne. He arranged for the child to be cared for while he was working at "Little Tots Learning Center." Heather Shaw, the director of the facility, testified that Father always brought the child to daycare on time, that he paid the bills on time, that when he arrived with the baby he always brought diapers and changes of clothes, and that the child was always properly groomed and clean. Father testified that because he was only earning minimum wage at Cracker Barrel, the funds to pay for the child's daycare came from his family in North Carolina.

Mother denied the truth of much of Father's testimony about her alleged abuse of alcohol and marijuana, and she offered testimony to minimize the implications of child neglect that Father's account of her behavior suggested. She also gave a very optimistic

account of the progress she was making in her music career. She further testified that although she lost her job at Cracker Barrel, she was employed several nights a week to conduct karaoke at a nightclub. She was also earning $10 an hour, two or three hours at a time, working as a personal assistant for a sixty-six year old businessman that she had met on Craigslist. If she had to work during her parenting time with the baby, she asked neighbors to babysit for her.

It was evident from the testimony of both Father and Mother that their life in Nashville involved considerable economic struggle and that the struggle became more intense after they separated. Father's father, James Port, testified about the career and living assistance that would be available to Father if the court allowed him to move back to North Carolina.

At the conclusion of the hearing, the trial court ruled from the bench. Before announcing its decision, the court discussed the prior proceedings before Judge Corlew and the order resulting from those proceedings. The court stated that "I think I'm bound by the judicial findings on most issues by the order of Chancellor Corlew because he made specific findings." The court also discussed the testimony it heard at trial, including the economic circumstances of the parties and the evidence that Father has appropriately cared for the child after Chancellor Corlew granted him temporary custody.

The court's decision was memorialized in an order which was entered on June 20, 2011, and was accompanied by a Permanent Parenting Plan. *See* Tenn. Code Ann. § 36-4-404. The court declared the parties divorced and found that it was in the best interest of the child that Father be named as his primary residential parent. The court also held that the relocation statute, Tenn. Code Ann. § 36-6-108, did not apply and that Father's proposed move to North Carolina was reasonable because of the evidence he presented of "job opportunities, residential opportunities, and stability opportunities which do not exist here." The court further found that without relocation, the child would be at risk.

The court stated that "there are serious problems with Respondent [Mother]" and declared that as result, any overnight visitation she chooses to exercise has to take place in North Carolina under the supervision of one of her relatives. Further "Respondent's time with the minor child shall continue to be supervised until there is competent evidence that there are no drug or alcohol issues continuing with Respondent and until she can maintain a safe environment for the parties' minor child."

Under the parenting plan, Mother was granted up to three days of supervised visitation each month, as well two weeks in the summer and alternate holidays. Mother was excused from payment of any child support, so that she would be able to pay her travel expenses to

and from North Carolina. The court noted that after six months in that state, the courts of Wake County, North Carolina would have jurisdiction of this case. *See* Tenn. Code Ann. § 36-6-205(7) (defining the "home state" of a child for the purposes of the custody statutes). This appeal followed.

## III. ANALYSIS

### A. The Standard of Review

Parenting and visitation arrangements are recognized as "among the most important decisions confronting a trial court in a divorce case." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (quoting *Rice v. Rice*, M1998-00973-COA-R3-CV, 2001 WL 812258, at *2 (Tenn. Ct. App. July 19, 2001)); *In re Lamont B., II*, M2004-02027-COA-R3-JV, 2006 WL 1727332, at *3 (Tenn. Ct. App. June 23, 2006) (no Tenn. R. App. P. 11 application filed). In making such decisions, the needs of the child are paramount, and the desires of the parent are secondary. *Chaffin v. Ellis*, 211 S.W.3d at 286.

While trial courts have broad discretion to make parenting decisions, their determinations must be made based upon proof and applicable principles of law. *Chaffin*, 211 S.W.3d at 286; *D.v.K.*, 917 S .W.2d 682, 685 (Tenn. Ct. App. 1995). Given the discretion involved and the fact that the decision often hinges on witness credibility, our court has stated that "appellate courts are loathe to second-guess a trial court's conclusion." *Chaffin*, 211 S.W.3d at 286; *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997).

The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d 714, 731 (Tenn. 2005); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). However, no presumption of correctness applies to the trial court's conclusions of law. *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005); *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001).

### B. The Best Interest of the Child

In any action for divorce where parenting or custody of a child is at issue, our legislature has directed the courts to include in its final decree a permanent parenting plan that designates one parent as the "primary residential parent," and the other as the "alternate residential parent." Tenn. Code Ann. § 36-6-404. For all practical purposes, those designations are the functional equivalent of the designation of custodial and non-custodial

parents under Tenn. Code Ann. § 36-6-101 *et seq*.

The permanent parenting plan must include a residential schedule, which is defined in Tenn. Code Ann. § 36-6-402(3) as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a Residential Schedule." The residential schedule "shall designate in which parent's home each minor child will reside on given days of the year . . . ." Tenn. Code Ann. § 36-6-402(5).

A trial court's determination of a post-divorce parenting plan for a minor child must be made upon the basis of the best interest of the child. Tenn. Code Ann. § 36–6–401. Such determinations are not intended to either reward or to punish parents, *Earls v. Earls,* 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000), but rather to place the child in an environment that will best serve its physical and emotional needs. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996).

The legislature has set out a list of factors for the courts to consider when determining the parenting plan that is in the best interest of the child. Tenn. Code Ann. § 36-6-404(b).[1]

---

[1]The factors to be considered in adopting a residential schedule, as set out in Tenn. Code Ann. § 36-6-404(b), are:

    (1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

    (2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

    (3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

    (4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

    (5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

    (6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

    (7) The love, affection, and emotional ties existing between each parent and the child;

    (8) The emotional needs and developmental level of the child;

    (9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

    (10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

    (11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

    (12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(continued...)

Mother argues that the trial court's final order in this case was defective because it did not contain specific findings of fact in reference to the statutory factors and because the court relied inappropriately on Chancellor Corlew's findings. We note that Mother does not specifically argue that it would be in the best interest of the child for her to exercise primary responsibility for the child's care. Rather, she asks this court to remand the case to the trial court for further hearing and for a fresh determination of the best interest of the child in the light of the statutory factors.[2]

While the trial court is directed to consider the appropriate factors in reaching its decision, it is not required to list each factor with the court's conclusion about how that factor impacted the custody decision. *Cain v. Cain,* M2006-02259-COA-R3-CV, 2008 WL 2165963 (Tenn. Ct. App. May 16, 2008) (no Tenn. R. App. P. 11 application filed). *See also*, *Woods v. Woods*, M2006-01000-COA-R3-CV, 2007 WL 2198110, at *2 (Tenn. Ct. App. Jul. 26, 2007) (no Tenn. R. App. P. 11 application filed); *Matlock v. Matlock*, M2004-01379-COA-R3-CV, 2007 WL 1452691, at *5 (Tenn. Ct. App. May 16, 2007) (no Tenn. R.App. P. 11 application filed) (citing *Bell v. Bell*, W2004-00131-COA-R3-CV, 2005 WL 415683, at *5 (Tenn. Ct. App. Feb. 22, 2005)).

If the court has not set out specific findings of fact incorporating its reasoning about the statutory factors, the appeals court may remand the case to the trial court to make such findings, as Mother urges, or we may ourselves make an independent review of the record to determine if it supports the trial court's conclusions. Since there is a complete transcript of the two-day final hearing in the record, there is a sufficient basis for us to the exercise the second option, which we choose in the interest of judicial economy.

We find that even if we totally disregard Judge Corlew's order, the transcript contains more than enough evidence to support the trial court's decision to designate Father as the

---

[1](...continued)
(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;
(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;
(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and
(16) Any other factors deemed relevant by the court.

[2]Mother cites Tenn. Code Ann. § 36-6-106(a) as the source of the statutory factors the trial court is obligated to consider when determining the custody and the best interest of the child. Those factors are similar, but not quite identical, to the statutory factors set out in Tenn. Code Ann. § 36-6-404 for the court to consider when the issue before it is the creation of a parenting plan.

primary residential parent. For example, one of the statutory factors the court is directed to consider is "[t]he parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult." Tenn. Code Ann. § 36-6-404(1).

This means among other things, that the parent must be willing to set aside his or her own personal preferences if necessary to meet the child's needs. Father's unrebutted and consistent testimony at trial show that he is well aware that the needs of his child have to be his first priority, and that he has made every effort to put his child first, and in his own words, to "be the adult your child needs you to be."

In contrast, Mother's testimony shows that her priorities were elsewhere and that she often took a very casual attitude towards the child's well-being. For example, she admitted that she dropped the child on the floor, but her testimony showed that she didn't feel it was any big deal. At other times, she would leave him strapped in his chair in a wet diaper, while drinking beer or smoking marijuana. Mother did not deny that she drank and smoked in the presence of the child, although she did attempt to minimize the frequency of such incidents and the quantity of alcohol or marijuana consumed.

Another listed factor is "[t]he degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities." Tenn. Code Ann. § 36-6-404(6). While there is no doubt that Father has been the child's primary caregiver since the entry of Chancellor Corlew's order granting him temporary custody of the child, the proof also showed that even when Father and Mother were living together, Father often assumed greater responsibility for feeding and changing the child than did Mother, despite the fact that he was working longer hours outside the home than Mother was.

Still another factor is "[t]he character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child." Tenn. Code Ann. § 36-6-404(9). No proof was presented about the physical condition of either party, but Father's testimony demonstrated strength of character. While he was emotionally steadfast in trying to protect his child from neglect, he did not express any animosity towards Mother based on her shortcomings. He stated that she needed help. Mother's admitted use of an anti-depressant drug in combination with alcohol also suggests emotional instability.

These and some of the other statutory factors clearly support the adoption of a parenting plan that leaves the child primarily in Father's care. A review of the record and all the relevant factors confirms the trial court's decision on best interests. In sum, the trial court did not err in designating Father as the child's primary residential parent.

-10-

## C. The Question of Relocation

The Parental Relocation Statute, Tenn. Code Ann. § 36-6-108, was adopted to assist courts in making determinations regarding relocation by the custodial parent. That statute established a legal framework for deciding whether parental relocation should be permitted after the entry of a final order of custody or of a permanent parenting plan.

The language of the statute left it unclear whether it also applied during the pendency of a divorce action, before the entry of a final order. However, in a series of cases beginning with *Gregory v. Gregory,* W2002–01049–COA–R3–CV, 2003 WL 21729431 (Tenn. Ct. App. July 14, 2003) (no Tenn. R. App. P. 11 app. filed), this court has held that the framework of the Parental Relocation Statute should not be applied when the court is making the initial custody decision or parenting arrangement. Other cases reaching the same conclusion include *Nasgovitz v. Nasgovitz,* M2010-02606-COA-R3-CV, 2012 WL 2445076 (Tenn. Ct. App. June 27, 2012)(no Tenn. R. App. P. 11 application filed); *Morris v. Morris*, No. W2010–00293–COA–R3–CV, 2011 WL 398044, at *9 (Tenn. Ct. App. Feb. 8, 2011) (no Tenn. R. App. P. 11 application filed); and *Rudd v. Rudd,* No. W2009–00251–COA–R3–CV, 2009 WL 4642582, at *6 (Tenn. Ct. App. Dec. 9, 2009) (no Tenn. R. App. P. 11 application filed).

In such cases, the possibility of relocation is simply another factor to be taken into account as part of the analysis of the best interest of the child. Mother faults the trial court for turning to the issue of Father's proposed relocation to North Carolina after deciding that it was in the child's best interest to remain under Father's primary care, rather than considering relocation in conjunction with the question of the child's best interest. But we believe that the result would be the same in this case regardless.

The proof showed that Father worked for five or six years as an optical technician before he married. His father, James Port, a vision center manager at a Walmart in Raleigh, testified that there was a need for opticians in North Carolina and that a program at Durham Technical Community College would enable Father to become a licensed optician after six months or a year of study. Father testified that he intended to enroll in the program and obtain his license, so he would be better able to provide for his son. The proof showed that the starting wage for a licensed optician in North Carolina is about $25 per hour. No comparable license is needed to do the same type of work in Tennessee, where the pay averages between $10 and $12 per hour.

James Port also testified that he had a fully furnished apartment in the attic of his home, where Father and his child can stay for as long as they wish, and that he was prepared to help Father take care of the child and to furnish other kinds of assistance as needed. "As

my son, he's always welcome and I will help him in any way I can." There was evidence that Father's other relatives in North Carolina would help out as well.

There was almost no proof about Father's mobile home in LaVergne, but there was ample proof that the mobile home where Mother lived and the community where it was located did not provide a particularly good environment for a young child. Father testified that Mother had two large dogs, a German Shepherd and a Labrador Retriever. He further testified that when the dogs were outside, Mother tried to keep them in a small pen, but that "if you don't clean up after them in this confined space, they track their own stuff back inside, and it can get pretty bad." Father further testified that when he returned to Mother's mobile home in December of 2010, he not only found the child strapped in his high chair and soaked with urine, but there were beer cans everywhere and the smell made it evident that Mother was not cleaning up after the dogs.

Mother called two of her neighbors as witnesses to testify about the quality of her care of the child. Pam Alvarado testified that she had known Mother for six or eight months, that she sometimes visited with her, and that she babysat on one occasion. Her nineteen year old son, Luke Ford, testified that he also visited Mother a couple of evenings a week. Ms. Alvarado testified that the child was always clean and well cared for, that Mother always promptly changed the baby's diaper whenever necessary, and that Mother "would do without before the baby would."

Ms. Alvarado was also asked about whether the mobile home community was safe, and she responded that "it's a lot better than where I came from down in that Florida trailer park." She was also asked if she thought it was appropriate for a nineteen year old boy to hang out with a mother in her early thirties who was going through a divorce. She answered, "I prefer my son to hang out over there than the druggie people's house." The son showed up to testify with his arm in a sling. The proof showed that he had been beaten up just a few days before trial, "from that stupid guy down in the trailer park that's on probation and everything else." Ms. Alvarado acknowledged that there was a lot of alcohol and drug use in the trailer park, and she stated that she intended to speak to the manager about that.

We do not feel any need to further belabor the point. The evidence is overwhelming that it would be in the best interest of the child for Father and his child to relocate to North Carolina, where Father is determined to provide him with a better life than is possible for him to establish in Tennessee.

### D. The Restrictions on Mother's Visitation.

Mother argues that by allowing Father to move to North Carolina with the child and

limiting her visitation time, the trial court's order has the effect of depriving her of the right to maintain the parent-child relationship, and that it was not in keeping with case law stating that "the least restrictive visitation limits are favored in order to encourage the parent-child relationship." *See* Tenn. Code Ann. § 36-6-301; *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1983); *Burlew v. Burlew*, W2005-00526-COA-R3-CV, 2006 WL 26361 at *4-5 (Tenn. Ct. App. Jan. 5, 2006) (no Tenn. R. App. P. 11 application filed). Mother contends that because of the tender age of her child, she will likely lose her connection with him if she is not granted more generous visitation rights.

Mother relies on the case of *Rudd v. Rudd*, W2009-00251-COA-R3-CV, 2009 WL 4642582 (Tenn. Ct. App. Dec. 9, 2009) in which the trial court allowed the mother to relocate to Texas with the parties' two children and terminated all of the father's visitation rights. This court affirmed the relocation, but held that the trial court was not entitled to completely terminate the father's visitation rights in the absence of "clear and definite evidence that visitation would harm the child." *Rudd v. Rudd*, 2009 WL 4642582 at *9. The *Rudd* court relied on case law as the basis for its determination, but did not mention a legislative enactment that sets out the circumstances under which a trial court may incorporate limits on visitation within a parenting plan.

Tenn. Code Ann. § 36-6-406 sets out a number of different circumstances that might justify such restrictions and authorizes the court to "preclude or limit any provisions of a parenting plan," if it finds after a hearing that any factor exists which could have an adverse effect on the child's best interest, including the following:

> (1) A parent's neglect or substantial nonperformance of parenting responsibilities;
> (2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;
> (3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
> (4) The absence or substantial impairment of emotional ties between the parent and the child;
> (5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;
> (6) A parent has withheld from the other parent access to the child for a protracted period without good cause;
> (7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or
> (8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Tenn. Code Ann. § 36-6-406(d).

In its ruling from the bench, the trial court specifically mentioned Tenn. Code Ann. § 36-6-406 and stated that there was proof of Mother's neglect or substantial nonperformance of her parenting responsibilities as well as of impairment resulting from drug and alcohol abuse that interferes with the performance of her parenting responsibilities. There is, thus, statutory justification for restricting Mother's visitation.

The trial court acknowledged that there was an inherent tension between the policy preference for frequent and regular contact between both parents and their child and a relocation that makes it difficult for one parent to maintain contact with child. The court nonetheless declared that Father's relocation remained in the child's best interest because of the economic and family advantages that would accrue to the child from such a move.

The court granted Mother three days of supervised visitation per month in the home of one of her North Carolina relatives and stated during its ruling from the bench that "there is no reason that she should not have more time with the child once she gets her life straightened out." There is ample proof in the record to support a requirement that Mother's visitation be supervised and it is reasonable to restrict her visitation to North Carolina.

**IV.**

The judgment of the trial court is affirmed. Tax the costs on appeal to the appellant, Veronica Hatton.

_____
PATRICIA J. COTTRELL, JUDGE

-15-