IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 21, 2014 Session

## CHANNIN S. HUGHES v. NORMAN T. HUGHES

**Direct Appeal from the Chancery Court for Hickman County**
**No. 11-CV-4368      Robbie T. Beal, Judge**

**No. M2013-01558-COA-R3-CV - Filed December 16, 2014**

This case involves a child custody dispute between two parents in the midst of a divorce proceeding with an unusual procedural history. After considering all the evidence presented during the divorce trial, the trial judge orally ruled that the mother would be designated the primary residential parent. About two weeks later, prior to the entry of any written order, the father filed a motion to reopen the proof or, in the alternative, to reconsider the ruling, seeking to present additional evidence about facts that occurred after the final hearing. The trial court denied the motion but instructed the father to present the additional facts via a petition to modify. The father then filed a petition to modify the primary residential parent designation. After an evidentiary hearing, the trial judge dismissed the father's petition to modify, finding that the facts presented did not "amount to a change of circumstance so great as to remove custody from the Mother." Thereafter, the trial court entered the final decree of divorce and parenting plan from the divorce trial. Father timely filed separate notices of appeal from these orders. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Douglas Thompson Bates, IV, Centerville, Tennessee, for the appellant, Norman T. Hughes

Kenneth K. Crites, Centerville, Tennessee, for the appellee, Channin S. Hughes

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Channin S. Hughes ("Mother") and Norman T. Hughes ("Father") were married in November 2008. Mother had two daughters from a prior relationship, and Mother and Father also had two daughters during their brief marriage – one born in April 2009 and another born in July 2010. Mother and Father separated in February 2011, and Mother filed a complaint for divorce in the chancery court of Hickman County. She sought to be named primary residential parent of their two children, who were both under the age of two. The parties informally attempted reconciliation, but the divorce case remained pending. In July 2011, Father moved to Montana for a lucrative job opportunity.

On August 19, 2011, Mother filed a petition for an order of protection against Father, alleging that he was placed in a mental facility in Montana on August 18 after he threatened to commit suicide. Mother claimed that she feared for her safety because Father had been released and was on his way to Tennessee, and he sent her a text message stating that it was all her fault. Thereafter, the parties agreed that Father would be permitted visitation with the children at his parents' home. Following a hearing, the chancery court entered an order of protection finding that Father "[d]id the things listed in the Petition." The court found credible evidence that Father had abused or threatened to abuse Mother and posed a threat to her. The order required Father to "stay away" from Mother and have a mental evaluation. However, pending further hearings, the order provided that the children would primarily reside with Father and have visits with Mother every other weekend. Father's mother was to meet Mother to exchange the children. The order prohibited the parties from exercising parenting time in the presence of members of the opposite sex.

Father subsequently filed a counter-complaint for divorce, alleging that Mother physically and verbally abused him during the marriage. He sought to be named primary residential parent of the parties' two young children. On October 25, 2011, the trial court held a hearing to consider a pendente lite parenting schedule. The court entered a written order on November 4, 2011, providing that Father would continue to serve as primary residential parent, and Mother would have parenting time every other weekend. The order stated that the order of protection would remain in effect, and neither parent was permitted to exercise parenting time around unrelated members of the opposite sex.

On February 6, 2012, the State of Tennessee filed a petition, on Father's behalf, to set Mother's child support obligation. The proceedings then became more contentious. On February 28, 2012, Mother filed a motion for a temporary restraining order and extraordinary relief, asking the court to immediately transfer custody of the children to her. As grounds

for such relief, Mother claimed that Father failed to produce the children for her every other weekend visitation twice during the month of February and concealed the children from her. Mother also claimed that Father came within 100 feet of her at a fast food restaurant and threatened the life of her companion, Billy Gaddis. Mother alleged that Father was arrested for violating the order of protection and that a sheriff's deputy forcibly entered Father's home to apprehend him while serving the arrest warrant. She also claimed that Father threatened law enforcement officials. In short, she claimed that Father demonstrated erratic and dangerous behavior as well as mental instability that would justify transferring custody to her.

The trial court held a hearing on March 14, 2012, and heard testimony from several witnesses, including Mother, Father, two sheriff's deputies, and a caseworker from the Tennessee Department of Children's Services ("DCS").[1] The record before us does not contain a transcript from the hearing, but the trial court's written order, entered April 17, 2012, found "evidence to support that the Court's previous orders have not been followed with regard to the minor children[.]" The court found "no evidence that there has been any harm to the welfare of the children; however [Father] has exercised poor judgment that could have resulted in harm to the minor children." Accordingly, the trial court immediately transferred temporary custody of the children to Mother pending the final divorce hearing. The court extended the order of protection. Father was allowed parenting time with the children every other weekend, but only at the home of his parents, who would monitor the visits. In addition, the order provided that the children could have no extended contact with unrelated members of the opposite sex, and it specifically stated that "the children shall not be placed in contact with Billy Gaddis."

The divorce trial was held on November 15, 2012.[2] By the time of trial, the children were ages two and three. The trial court heard testimony from Mother, Mother's mother, Father, a sheriff's deputy, and a private investigator. The sheriff's deputy testified that he went to Father's residence to serve an arrest warrant in February 2012, but Father refused to answer the door, so the officer tore down the door and forcibly entered. The two minor children were present at the home. The deputy testified that he had to forcibly arrest Father, who was irate because he was arrested in front of the children.

At the time of trial, Father was living near Nashville. He testified that he was the primary caregiver for the children during the marriage and mostly responsible for changing

---

[1] Judge Timothy Easter presided over the trial court proceedings prior to this point. Beginning with this hearing, Judge Robbie Beal presided over the proceedings.

[2] The parties stipulated as to the separation of property and debt, and neither requested alimony.

the children's clothes and diapers and feeding them. Father testified that Mother was always on the computer looking at social networking sites or playing games. Father testified that the children cry and throw fits when they have to return to Mother. He claimed that he should be named primary residential parent because of his ethics and morals and because he takes better care of the children. He claimed that Mother's family was highly unstable and often involved in criminal activity.

Father testified that he went to a mental health facility in the past because Mother's "excessive abusiveness" caused him to have low self-esteem. He conceded that he "needed some help at that particular time." Father testified that he was diagnosed with transient depression and treated with medication, but his doctor later determined he no longer needed it. Father denied that he was suicidal in Montana but admitted that he left a note with one of his co-workers and recorded a greeting on his voice mailbox that would cause a reasonable person to become concerned.

Father acknowledged that he withheld the children from Mother during the two weekends at issue in February 2012. He testified that the children were very ill with RSV during the first weekend, and the second weekend, he did not send them because one of the children stated that Mother's boyfriend, Mr. Gaddis, touched her inappropriately. Father took the child to a doctor, and the matter was investigated by DCS but deemed unfounded. Father also described the incident involving him and Mr. Gaddis at the fast food restaurant. He claimed Mr. Gaddis was in the parking lot yelling obscenities as Father and the children were waiting at the drive-thru, so he simply revved his engine to move away from him as quickly as possible.

Father had a felony conviction for aggravated assault from 1995. In addition, during the marriage, the sheriff's department and police department were called to the parties' residence on numerous occasions. Father pled guilty to a charge of domestic assault on Mother. He testified that Mother was physically abusive to him during the altercation that led to the charge, but she promised to stay in the relationship if he pled guilty. Father admitted calling the sheriff's department and leaving an angry voice message during the divorce proceeding because, he claimed, no one responded to his report that Mother was allowing Mr. Gaddis to be in contact with the children. The recording of the message was introduced at trial, and it is filled with expletives and threats to sue the sheriff and various employees of the department. He also contacted Mother's employer and stated that Mother was involved with someone who uses drugs. Father testified that Mr. Gaddis sold drugs and had a criminal record for simple possession, theft, and contributing to the delinquency of a minor.

Mother testified that she never should have married Father. She described incidents

of "heated disagreements and temper tantrums" between Father and her even prior to the marriage. The sheriff's department was called to the home on numerous occasions prior to and during the marriage. On one occasion when Father was angry, he used an ax to demolish a canoe he built, and on another occasion, he took all of the furniture out of the house. Mother described another incident, during the divorce proceeding, when Father "chased" her vehicle while driving his vehicle and simultaneously recording her with a video camera. The children were in the vehicle with Father during this incident. Mother testified that she had been investigated by DCS "many times" as a result of complaints by Father and his family members. Mother admitted that several of her family members had criminal records but said she did not have any charges herself. When asked to describe Father as a parent, Mother said, "He's good to [the children]." She acknowledged that the children love Father and said she wants the children to maintain a meaningful relationship with him. Mother said her "only concern" was that Father would do something irrational or start an argument with her in front of the children if the order of protection was dismissed. Mother's mother similarly testified that she had seen Father "in a rage" in the past, such as the incident with the ax, but she testified that he is "fine" with the children.

Mother claimed that she was the primary caregiver for the children and that they were the priority in her life. Mother admitted she had engaged in a romantic relationship with Billy Gaddis but claimed that they had since become "just friends." During cross-examination, however, she testified that they were still dating and that they had simply "slowed down" their relationship. Mother was asked about Mr. Gaddis's criminal record, and she replied, "All that I know is he had a Misdemeanor when he was like 19. He got caught drinking under the age of 21. I don't know of anything else." However, when shown Mr. Gaddis's arrest record, Mother admitted she knew that Mr. Gaddis was arrested a few weeks before trial for possession of marijuana. Mother was asked whether she had complied with the trial court's April 2012 order stating that "the children shall not be placed in contact with Billy Gaddis," and Mother insisted that she had. Counsel for Father asked Mother to look the trial judge in the eye and answer the question again, and Mother again said the children had not been in contact with Mr. Gaddis.

Father presented the testimony of a private investigator to contradict Mother's testimony. The investigator testified that he conducted mobile surveillance of the parties' custody exchange on Sunday, July 1, 2012. After Mother left the exchange with the children, she drove a short distance and met Mr. Gaddis in his vehicle. Mother, the children, and Mr. Gaddis then proceeded to Mother's house, where they entered the home. The only other visitation exchange the investigator observed was on Sunday, August 12, 2012, and he again observed Mr. Gaddis at Mother's residence after she picked up the children. Mother, Mr. Gaddis, the children, and other family members were having a barbecue outside, and Mr. Gaddis was "mingling" with the family. The investigator saw Mr. Gaddis's vehicle at

Mother's home on two other occasions on weekdays when Mother had parenting time with the children. On another occasion, the investigator observed Mr. Gaddis exiting the dead end road from Mother's home.

After the private investigator testified, Mother returned to the stand. She testified that Mr. Gaddis was routinely around her older two daughters, but she claimed that he "stays away" from the younger two daughters. She insisted that Mr. Gaddis was not "by" the younger daughters at the barbecue and that he had never been "in close quarters" in the house with them. She also testified that Mr. Gaddis had not spent the night at her home. Mother said she did not feel that she lied to the judge because Mr. Gaddis was not in "direct" contact with the younger children.

At the conclusion of the testimony, the trial judge addressed Mother and said that she clearly lied to him. The trial judge noted that he had never met Mr. Gaddis and said that he "may be a fine man." The problem, the judge said, was that Mother "lied to [him] as sure as the world," so the judge questioned whether he could believe anything Mother said or trust her in the future. The judge said that Mother "put [her] interests over that of [her] kids by violating my Court Order" and "found [her] relationship with [Mr. Gaddis] more important than making sure [her] kids stay with [her]." However, the trial judge said he did not believe "every word" of Father's testimony either and found that some of his answers were not believable.

The trial judge proceeded to discuss each of the statutory best interest factors that guide a trial court's decision when designating a primary residential parent. The judge found that both parents love the children and have strong emotional ties to them. The judge concluded that neither party could be considered the primary caregiver for the children during the marriage, as both provided for the children and "took up the slack of the other party." He found that Father was in a better financial position to care for the children but that Mother would be able to provide for the children's basic necessities, so consideration of their finances did not "carry much weight." The court also found that Father had more stable family support. However, the court found that Father's mental health was a "significant" and "unresolved" issue, as he had "temper issues" and "issues with regard to erratic behavior." The court found that Father, "on occasion when pressed acts in a very erratic unpredictable way and that's a problem." On the other hand, the court also found that Mother loves "drama" and "seems to thrive on it," and the court believed that Mother did things to make the parties' relationship more dramatic. The court found that Mother and Father were "incapable of working together" and that "both parties have done everything they can to inflame the other."

The court also discussed the character of the people frequenting Mother's home. The

court found that Mr. Gaddis and some of Mother's family members were "not people that the Court would appreciate necessarily being around the children to a huge extent," but the court noted that Mr. Gaddis's criminal record was not shocking and said that it did not lead the court to believe that Mother was not adequately protecting the children. Mainly, the court was concerned that Mother seemed to be "oblivious" to the fact that her behavior would impact the court's decision, which demonstrated "lack of judgment in caring for her child." In summary, the court described its dilemma and ultimate decision as follows:

> All of that to say, really the question boils down to since the Court is really unable to determine to any significant affect [sic] who the primary parent has been. I[t] comes down to does the Court trust the mother's judgment because of the people who she associates with or because of her behavior in Court today or do I trust the father's judgment because of his part [sic] behavior, that certainly can be considered erratic?
> In this particular case the Court believes that the mother should be awarded primary parenting responsibilities for these children. I believe it's more appropriate in this case. She did lie to the Court but I don't believe just based on the fact that you lied does that mean that you ultimately should lose your consideration for parenting responsibilities, certainly not. Does it affect her credibility, yes. But should it based on that should it forfeit her standing to be the more appropriate person to be the primary parent? Because the Court, quite frankly, believe[s] it could have found prior to any of that testimony the father's behavior in the relationship was of more concern than the mother's behavior. The Court is going to stay with that and going to grant her primary parenting responsibilities.[3]

The judge announced that Father would have parenting time with the children every other weekend and for the entire summer break with the exception of three weeks. The judge found that Father's concerns about Mr. Gaddis were "legitimate" and ruled that the children were to have "no contact" with him. The court declined to extend the order of protection.

Two weeks after the divorce trial concluded, but prior to the entry of a written order, Father filed a "Motion to Reopen Proof, or in the alternative to Reconsider." The motion alleged that Mr. Gaddis continued to have contact with the children after the divorce trial and was probably staying at the home overnight. The trial court held a hearing on December 12, 2012, and subsequently entered a written order denying Father's motion to reopen the proof

---

[3]The court explained that it considered but rejected a joint parenting arrangement because of the distance between Mother's home in Centerville and Father's home near Nashville and also because of the "toxic" relationship between the parents.

or reconsider its ruling. However, the court's written order stated that the court was "not immune to the allegations" and that it would retain jurisdiction in the matter to permit Father to file a petition to modify and/or a petition for contempt. On December 20, 2012, Father filed a petition for criminal contempt and petition to modify the designation of primary residential parent. According to the petition, after the divorce trial ended on November 15, 2012, Mother continued to violate the no-contact order by having Mr. Gaddis stay overnight at her residence on November 28 and 29 when she had custody of the children. Father alleged that these facts demonstrated a substantial and material change in circumstances and asked the court to conduct a best interest analysis to determine whether he should be designated primary residential parent. He also asked the court to find Mother in contempt of its order prohibiting contact between Mr. Gaddis and the children. Mother filed a response to Father's petition to modify and admitted that Mr. Gaddis had contact with the children on the aforementioned dates. She claimed that such contact was the result of her babysitter contracting the flu and leaving her with limited options for childcare.

On February 26, 2013, the trial court held an evidentiary hearing on the petition to modify. Three months had elapsed since the final divorce hearing on November 15, 2012; however, the trial court had not yet entered a final decree of divorce or parenting plan.[4] The private investigator testified that he conducted additional surveillance of Mother's residence after the divorce hearing but was concerned that Mr. Gaddis was hiding his vehicle somewhere on Mother's property. He hired a pilot and "took to the air," where he observed Mr. Gaddis's truck parked at the very back of the property, hidden between two sheds. He observed the vehicle in this location on November 29 and November 30, prior to 7:30 a.m. each morning.

Mother admitted that Mr. Gaddis had been in contact with the children and was helping her move after a tree fell on her house. She testified that Mr. Gaddis stays with her during the weekends when the children visit Father and said that her older children love him and call him "daddy." Mother and Father also presented additional evidence about numerous issues that were discussed during the original divorce hearing, such as Father's suicide threat in Montana and his 1995 conviction for aggravated assault, in addition to other events that occurred during the marriage.

At the conclusion of the testimony, the trial judge reiterated its previous sentiment that the court did not "have huge issues with Mr. Gaddis" and was more concerned with Mother's behavior. The court described the dilemma it originally faced during the divorce hearing,

---

[4]The trial judge had directed counsel for Mother to prepare the order. However, the entry of the order was apparently delayed because the order proposed by counsel failed to include a parenting plan or a specific amount for child support.

saying, "at that point you have got the father's judgment issues, and then you have got the mother who is willing to sacrifice what supposedly should be the most precious things in her life for someone who, you know, is just another man." The court said it was basically "posed with the problem again" and "still similarly situated as it was the last time." The judge continued,

> [s]o the shoe comes back down to the exact same issue that the Court had to rule upon in November. Is this issue so important that it weighs the factors so heavily against the mother that in essence she should lose the parenting, her primary parenting responsibilities. And the question is whether this Order is so important to the Court that it should relate so highly that it would cause the Court to reconsider the primary parenting responsibilities, and the answer is no.

The judge also said, "I don't believe that there's been a material change of circumstances significant for the Court to find that a new Parenting Plan should be entered." The trial judge did find Mother in contempt for violating its orders and sentenced her to ten days in jail, to be suspended after forty-eight hours served.

The trial court entered a written order dismissing Father's petition to modify on June 5, 2013. On June 21, 2013, the trial court entered a final decree of divorce and parenting plan from the November 15, 2012 divorce trial. Father filed separate notices of appeal from the June 5 and June 21 orders.

## II. ISSUES PRESENTED

Father presents the following issues, which we have slightly reworded, for review on appeal:

1.      Whether the trial court erred in designating Mother primary residential parent at the divorce trial; and

2.      Whether the trial court erred in failing to modify its oral ruling from the divorce trial after considering the petition to modify.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

### III. STANDARD OF REVIEW

The Tennessee Supreme Court recently described the standard of review that applies when an appellate court reviews a trial court's decision on a parenting arrangement:

In a non-jury case such as this one, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. See Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d at 692.

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Armbrister v. Armbrister*, 414 S.W.3d at 693. Determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)).

A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Armbrister v. Armbrister*, 414 S.W.3d at 693 (citing *Eldridge v. Eldridge*, 42 S.W.3d at 88). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister v. Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge v. Eldridge*, 42 S.W.3d at 88).

*Kelly v. Kelly*, – S.W.3d. –, 2014 WL 4437671, at *5-6 (Tenn. Sept. 10, 2014).

## IV. DISCUSSION

### *A. The Trial Court's Initial Decision*

First, we will consider Father's argument that the trial court erred in designating Mother as primary residential parent at the conclusion of the divorce trial. When choosing which parent to designate as the primary residential parent for a child, "the court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (quoting *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. 1983)). "The overarching 'standard by which courts determine and allocate the parties' parental responsibilities' after divorce is the 'best interests of the child.'" *Kelly*, – S.W.3d –, 2014 WL 4437671, at *9 (quoting Tenn. Code Ann. § 36-6-401(a)). In making this determination, the trial court is required to consider numerous statutory factors set forth in Tennessee Code Annotated section 36-6-106(a), among others. *See id.*

In the case before us, the trial judge described this is a "difficult case" to decide because both parents were "similarly disposed" in their ability to care for the children, but at the same time, both parents also demonstrated poor judgment. Mother obviously violated the court's orders and then lied about it in court. Father engaged in concerning and erratic behavior on numerous occasions, which the trial court found demonstrated unresolved mental health issues and an inability to control his temper. When announcing his decision, the trial judge specifically discussed his concerns regarding Father's past conviction for felony aggravated assault, his guilty plea on the domestic violence charge, his suicide threat in Montana, his demolition of the canoe, his inappropriate call to the sheriff's department, his inappropriate postings on Facebook, his decision to drive past Mother while trying to videotape her, and the fact that the sheriff's department was required to enter his residence by force with the children present. The trial judge also discussed each of the statutory factors and clearly articulated its findings as to each. The court concluded that the best interest factor regarding each parent's mental health weighed "heavily in [Mother's] favor," and the factor regarding physical abuse also weighed in her favor. The court found that Mother's associations demonstrated a lack of judgment but that they were not harmful to the children. The judge was clearly concerned by Mother's credibility but ultimately decided that her credibility issues did not "forfeit her standing to be the more appropriate person to be the primary parent." The trial judge said at the conclusion of the divorce trial, "I did what I thought was right for these kids today notwithstanding [Mother's] behavior." Given the trial court's thorough analysis of the evidence, and its unique ability to observe Mother and Father's testimony and gauge their credibility, we cannot say that the trial court abused its

-11-

discretion in designating Mother as the primary residential parent. As we noted above, a trial court abuses its discretion in establishing a residential parenting schedule only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See Kelly*, – S.W.3d. –, 2014 WL 4437671, at *6. The trial court's parenting arrangement in this case is well within the range of possible reasonable results.

### B. The Trial Court's Refusal to Modify its Initial Decision

"Once a permanent parenting plan has been incorporated in a final divorce decree, the parties are required to comply with it unless and until it is modified as permitted by law." *Armbrister*, 414 S.W.3d at 697 (citing Tenn. Code Ann. § 36-6-405). "A valid custody order or residential placement schedule, once entered by the court, is res judicata as to the facts in existence or reasonably foreseeable when the decision was made." *Birdwell v. Harris*, No. M2006-01919-COA-R3-JV, 2007 WL 4523119, at *3 (Tenn. Ct. App. Dec. 20, 2007) (citations omitted). Consequently, when assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred and then apply the statutory "best interest" factors of section 36-6-106(a) and other sections to determine how, if at all, to modify the residential parenting schedule. *Armbrister*, 414 S.W.3d at 697-98.

On appeal, Father argues that the trial court erred in refusing to modify its oral ruling from the divorce trial after considering his petition to modify. He asserts that he proved a material change in circumstance occurred after the divorce hearing. However, we find that the material change in circumstance standard for modifying a parenting plan was inapplicable. At the point in time when Father filed his petition to modify, the trial judge had orally announced his decision designating a primary residential parent, but no order was entered to that effect, and no parenting plan was in existence. In effect, Father was seeking to modify an order that did not exist. As noted above, a custody order or residential placement schedule is effective for purposes of res judicata "once entered by the court," *Duke v. Duke*, M2013-00624-COA-R3-CV, 2014 WL 4966902, at *27 (Tenn. Ct. App. Oct. 3, 2014), *perm. app. pending* (Dec. 3, 2014), when the custody decision is "final." *Dickerson v. Cantrell*, No. E2013-01732-COA-R3-CV, 2014 WL 2086636, at *5 (Tenn. Ct. App. May 16, 2014) (*no perm. app. filed*). In this case, however, the trial court considered and denied a petition to modify when no custody order or parenting plan existed.

This Court has previously held that a trial court committed reversible error by applying the standard for modifying a custody order in the context of a custody dispute when there was no final custody order in existence, and the parties were only operating under a temporary order. *Dillard v. Jenkins*, No. E2007-00196-COA-R3-CV, 2007 WL 2710017,

at \*3-4 (Tenn. Ct. App. Sept. 18, 2007). We said "there is a significant difference between the analysis employed by a trial court when making an initial custody determination or considering a petition for change of custody, and the differing analysis could easily produce a different result by the trial court." *Id.* at \*3. Accordingly, we remanded the case for the trial court to consider the custody issue using the proper legal standard. *Id.* at \*4.

Considering the unique facts of this case, however, we do not find reversible error by the trial court. When ruling on Father's petition to modify, the trial court found that Mother's continued violation of the court order did not "amount to a change of circumstance so great as to remove custody from the Mother." After the trial judge announced his ruling at the end of the hearing, counsel for Father questioned whether Father was prejudiced by the fact that the trial court required him to file a petition to modify rather than proceeding with his motion to reopen the proof. Counsel pointed out that "a much different standard" would apply if "the analysis [was] still the best interest" in the context of the original divorce hearing. The trial judge acknowledged that there was "some room for confusion" due to the awkward procedural posture of the case, and the judge said that he considered a petition to modify to be "procedurally . . . more appropriate." However, the judge said he ultimately concluded that the post-trial evidence presented was not "significant enough" to justify re-opening the proof, nor did it demonstrate a material change in circumstance. In other words, the trial judge expressed his opinion that he had "covered both procedures." He denied the motion to reopen proof and "also" found no material change in circumstance. Accordingly, we find that the result would have been the same whether the trial judge treated the motion as one to reopen the proof or as a petition to modify a custody order.[5]

In fact, the trial court appeared to engage in a best interest analysis through most of its oral ruling at the conclusion of the modification hearing. The trial judge recognized that it was faced with the same dilemma from the divorce hearing – comparing Mother's dishonesty and violation of court orders with Father's erratic behavior and anger issues. The court said it was "posed with the problem again" and "still similarly situated as it was the last time," considering "the exact same issue that the Court had to rule upon in November." The judge questioned whether the continued issue involving Mr. Gaddis was "so important that it weighs the factors so heavily against the mother that in essence she should lose the parenting, her primary parenting responsibilities," and the court found that it was not. Accordingly, we conclude that the trial court's use of the standard applicable to modification cases was harmless error under the unique facts of this case.

---

[5]This Court reviews a trial court's decision on a motion to reopen the proof for abuse of discretion. *Thompson v. Travelers Indem. Co.*, No. M2004-01913-WC-R3-CV, 2005 WL 2276891, at \*5 (Tenn. Workers Comp. Panel Sept. 20, 2005); *Gilbert v. Birdwell*, No. M2009-01743-COA-R3-CV, 2010 WL 1254368, at \*3 (Tenn. Ct. App. Mar. 31, 2010), *perm. app. denied* (Tenn. Sept. 23, 2010).

## V.  CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed. Costs of this appeal are taxed to the appellant, Norman T. Hughes, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE